584

STATE OF CALIFORNIA, Acting By and Through Governor Edmund G. BROWN, Jr., the California Coastal Commission, the California Air Resources Board, the California Resources Agency, and the California Department of Conservation, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF ALASKA, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

NATURAL RESOURCES DEFENSE COUNCIL, INC., Sierra Club, Conservation Law Foundation of New England, Inc., and Friends of the Earth, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

NORTH SLOPE BOROUGH, Jacob Adams, Mayor of the North Slope Borough, and Lloyd Ahvakana, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF CALIFORNIA, Acting By and Through Governor Edmund G. BROWN,

Jr., and the California Coastal Commission, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF ALASKA, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

NATURAL RESOURCES DEFENSE COUNCIL, INC., Sierra Club, Friends of the Earth, National Wildlife Federation, National Audubon Society, Conservation Law Foundation of New England, Inc. and Trustees for Alaska, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

NORTH SLOPE BOROUGH, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

CENALIULRITT, the Yukon-Kuskokwim Coastal Resource Service Area Board, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF FLORIDA ex rel. Bob GRAHAM, Governor, and Jim Smith, Attorney General: State of Florida Department of Natural Resources: State of

Florida Department of Environmental Regulation, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF WASHINGTON, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

CITY OF LOS ANGELES, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF OREGON, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF OREGON, Petitioner,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents.

Nos. 80–1894, 80–1897, 80–1935, 80–1991, 82–1822, 80–1823, 80–1824, 80–1825, 82–1826, 82–2081, 82–2085, 82–2097, 82–2102 and 82–2118.

United States Court of Appeals, District of Columbia Circuit.

Argued 23 May 1983.

Decided 5 July 1983.

brief for petitioners in Nos. 80–1894 and 82–1822.

Lauri J. Adams, Asst. Atty. Gen., State of Alaska, with whom Wilson Condon, Atty. Gen., State of Alaska, and Jonathan K. Tillinghast, Sp. Asst. Atty. Gen., State of Alaska, were on brief for petitioner in Nos. 80–1897 and 82–1823.

James M. Hecker, with whom Bruce J. Terris and Edward H. Comer, were on brief for petitioners in Nos. 80–1991 and 82–1825.

Sarah Chasis, with whom Jane Bloom, were on brief for petitioners in Nos. 80–1935 and 82–1824.

Norman A. Cohen, was on brief for petitioner in Nos. 82–2102 and 82–2118.

Kay Kiner James, Asst. Atty. Gen., State of Oregon, with whom William F. Gary, Sol. Gen., State of Or., were on brief for petitioner in No. 82–2085.

Charles B. Roe, Jr., Senior Asst. Atty. Gen., State of Wash., was on brief for petitioner in No. 82–2085.

Charles H. Martin, and Bruce Barkett, Attys., State of Florida, entered appearances for petitioner in No. 82–2081.

Jan Chatten-Brown, Senior Asst. City Atty., entered an appearance for petitioner in No. 82–2097.

Wells D. Burgess, Atty., U.S. Dept. of Justice, for respondents. Carol E. Dinkins, Asst. Atty. Gen., U.S. Dept. of Justice, was on brief for respondents.

E. Edward Bruce, with whom Bobby R. Burchfield, Constance J. Chatwood, Stark Ritchie and David T. Deal, were on the brief for intervenors.

Stephen M. Leonard, Asst. Atty. Gen., Commonwealth of Massachusetts, was on the brief for amicus curiae, Francis X. Bellotti, Atty. Gen., Commonwealth of Massachusetts, urging remand to the Secretary for reconsideration.

Michael Axline and Richard Hildreth, were on brief for amicus curiae, Oregon Shores Conservation Coalition, Inc., et al., urging remand to the Secretary for reconsideration in Nos. 82–2102, 82–2118, 82–2081, 82–2085 and 82–2097. John E. Bonine

John A. Saurenman, Deputy Atty. Gen., State of Cal., with whom Theodora Berger, Deputy Atty. Gen., State of Cal., were on

also entered an appearance for Amicus Curiae in No. 82–2102.

Before ROBINSON, Chief Judge, WILKEY and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This case requires the court, for the second time, to review the Secretary of Interior's proposed five year schedule of offshore oil and gas leasing activity. After our first review we remanded the program to the Secretary to correct defects resulting largely from the Secretary's erroneous interpretation of the relevant statute. This time we uphold the program, concluding that the earlier errors have been rectified and that the overall program now conforms with the requirements of the Outer Continental Shelf Lands Act.

## I. BACKGROUND

### A. *The Statutory Scheme*

The Outer Continental Shelf Lands Act,[1] enacted in 1953, authorizes the Secretary of the Interior to grant leases for the development of oil and gas deposits contained in the shelf's submerged lands. Congress amended[2] the Act in 1978[3] in order to "promote the swift, orderly and efficient exploration of our almost untapped domestic oil and gas resources in the Outer Continental Shelf."[4] The 1978 amendments outlined a five step process for achieving this expeditious but orderly development. The first step is the adoption of a five-year leasing program which contains a proposed schedule of lease sales.[5] This is followed by sale of the leases,[6] exploration,[7] development and production,[8] and ultimately, sale of the recovered minerals.[9] The five step process is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent."[10] Additional study and consideration is required before each succeeding step is taken. Thus, while an area excluded from the leasing program cannot be leased, explored, or developed, an area included in the program may be excluded at a latter stage. The present challenge is to the first, and thus broadest-based, portion of the process—the five-year leasing program adopted pursuant to section 18.

Section 18 requires the Secretary to prepare, maintain, and periodically revise a five-year leasing program consisting of a "schedule of proposed lease sales, indicating, as precisely as possible, the size, timing and location of leasing activity."[11] The program must be prepared and maintained in accordance with four principles. Since these are basic to the Secretary's action, the petitioners' challenge, and our own analysis, we set them forth textually in full:

(1) Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.

1. 43 U.S.C. §§ 1331–1356 (1976 & Supp. V 1981).

2. Events leading up to the 1978 amendment are outlined in *California v. Watt*, 668 F.2d 1290, 1295–96 (D.C.Cir.1981) (per curiam).

3. PUB.L. No. 95–372, Title II, 92 Stat. 632 (1978).

4. H.R.REP. No. 95–590, 95th Cong., 1st Sess. 53 (1977), U.S.Code Cong. & Admin.News 1978, p. 1450, 1460.

5. 43 U.S.C. § 1344 (Supp. V 1981).

6. *Id.*, § 1337.

7. *Id.*, § 1340.

8. *Id.*, § 1351.

9. *Id.*, § 1353.

10. *California v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir.1981).

11. 43 U.S.C. § 1344(a) (Supp. V 1981).

(2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of—

(A) existing information concerning the geographical, geological, and ecological characteristics of such regions;

(B) an equitable sharing of developmental benefits and environmental risks among the various regions;

(C) the location of such regions with respect to, and the relative needs of, regional and national energy markets;

(D) the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf;

(E) the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

(F) laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

(G) the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf; and

(H) relevant environmental and predictive information for different areas of the outer Continental Shelf.

(3) The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

(4) Leasing activities shall be conducted to assure receipt of fair market value

for the lands leased and the rights conveyed by the Federal Government.[12]

The present litigation focuses on the Secretary's compliance with these principles in preparing and adopting the latest five-year leasing program.

## B. *The Present Litigation*

On 16 June 1980 the Secretary adopted a five-year leasing program containing a schedule of proposed lease sales for the years 1980–1985. This program, largely prepared by Secretary Andrus, was challenged in this court by various state and local governments and several environmental groups. In an opinion filed 6 October 1981,[13] this court found "much of the Secretary's program is free of infirmity," [14] but noted that the existence of several deficiencies required it to remand the program to Secretary Watt for revision in accordance with its opinion. Specifically, the court held that the Secretary erred in failing

(1) to identify Sales 73 and 80 with greater specificity, (2) to consider the need to share developmental benefits and environmental risks among the various OCS regions, (3) to consider the relative environmental sensitivity and marine productivity of different areas of the OCS, (4) to base timing and location of leasing on some of the standards of section 18(a)(2), (5) to strike a proper balance incorporating environmental and coastal zone factors and not simply administrative need and economic factors such as potential oil and gas recovery, (6) to quantify environmental costs to the extent they are quantifiable, and (7) to adequately explain his determination of net economic value, particularly the economic effects of delaying leasing.[15]

The court retained jurisdiction over the case and directed that lease sales scheduled to

---

12. *Id.*

13. *California v. Watt,* 668 F.2d 1290 (D.C.Cir. 1981) (per curiam) (*Watt I*).

14. *Id.* at 1325.

15. *Id.*

occur during the remand period be allowed to proceed.[16]

At the time Secretary Watt was in the process of revising and reapproving the program pursuant to section 18(e).[17] On 19 January 1982 the court issued an order in which it adopted the Secretary's position that he could meet the court's remand in the course of the revision and approved the Secretary's proposed timetable for completing the revision. On 21 July 1982 the Secretary approved the final five-year leasing program for the years 1982–1987. Petitioners in Nos. 82–1822, 82–1823, 82–1824, 82–1825, 82–1826, 82–2081, 82–2085, 82–2097, 82–2102, and 82–2118 challenged various aspects of that plan. Those petitions were consolidated with the earlier petitions over which this court retained jurisdiction.[18]

Petitioners launch a multi-pronged attack on the new five year program. They contend that (1) the program fails to indicate the size and location of leasing activity "as precisely as possible" as required by section 18(a); (2) the Secretary failed to give adequate consideration to, or base the program on, the environmental factors listed in 18(a)(2); (3) the Secretary violated section 18(a)(3) by making arbitrary assumptions and using incorrect methodology to ascertain the costs and benefits of leasing; (4) the program violates section 18(a)(4) because it fails to assure receipt of fair market value; (5) the Secretary failed to consider the environmental impact of the leasing program on Oregon and Washington causing him to violate section 18(a)(1), (2), and (3) of the OCLSA and section 102 of the National Environmental Policy Act;[19] and (6) the program violates section 18(f)(5) by failing to outline when the Secretary will make consistency determinations under section 307(c)(1) of the Coastal Zone Management Act.[20] We reject each of these arguments, concluding that the program under review meets the statutory guidelines laid down by Congress.

## II. STANDARD OF REVIEW

At the outset it is important to note the difference between the nature of the challenges presented in this case and the challenges presented in *Watt I*. In *Watt I* the court noted that the five year program is based on three types of determinations: (1) the Secretary's factual findings, (2) the Secretary's policy judgments, and (3) the Secretary's legal interpretations. The court set out the standard for reviewing each of these types of determinations, stating that review of the first two types of determinations is quite deferential.

When reviewing findings as ascertainable fact made by the Secretary, the substantial evidence test guides our inquiry. When reviewing the policy judgments made by the Secretary, including those predictive and difficult judgmental calls the Secretary is called upon to make, we will subject them to searching scrutiny to ensure that they are neither arbitrary nor irrational—in other words, we must determine whether "the decision [was] based on a consideration of the relevant factors and whether there has been a clear error of judgment."[21]

16. *Id.* at 1326.

17. 43 U.S.C. § 1344(e) (Supp. V 1981). Section 18(e) directs the Secretary to review the leasing program annually and authorizes him to revise and reapprove the program "at any time."

18. Petitioners in the consolidated cases include the States of California, Alaska, Florida, Washington and Oregon, the Natural Resources Defense Council, Inc., the Sierra Club, the Conservation Law Foundation of New England, Inc., Trustees for Alaska, the Friends of the Earth, National Wildlife Federation, the National Audubon Society, the North Slope Borough and Cenaliulrit (the Yukon-Kuskowim Coastal Re-

source Service Area Board). The Commonwealth of Massachusetts, the Oregon Shores Conservation Coalition, the Oregon Environmental Council, and the Oregon Wilderness Coalition filed as amicus curiae in support of petitioners' position.

19. 42 U.S.C. § 4332 (1976).

20. 16 U.S.C. § 1456(c)(1) (1976).

21. *Watt I,* 668 F.2d at 1302 (quoting in part *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)).

The Secretary's interpretation of the statute, on the other hand, while entitled to some deference, is reviewed under a stricter standard, the court observed, because "the interpretation of statutes is a matter which ultimately lies in the province of the judiciary." [22]

The distinction between review of factual findings and policy judgments and review of legal interpretations is important in this case because the majority of the defects noted in *Watt I* concerned the previous Secretary's erroneous interpretation of the statute.[23] The Secretary had misread the statute and, as a result, failed to perform the requisite analysis. On the other hand, with only a few exceptions, the challenges advanced by petitioners in this case concern the *adequacy* of the Secretary's analysis. They question the factual findings or policy judgments at the base of the Secretary's conclusions. These are matters on which the Secretary is entitled to greater deference. Thus, overall, the Secretary's determinations with respect to the matters being challenged in the present case are entitled to more deference than those which were struck down in *Watt I.*

It is also important to note that the suspicion which sometimes arises when an agency reaches the same result after remand does not apply in the present context. This is not a case in which the agency had an incentive to defend its prior actions. The original five year plan was formulated by Secretary Andrus during the Carter Administration. On remand Secretary Watt, a member of the Reagan Administration, took a hard look at the program, and came up with a program resembling the earlier one in many respects. Secretary Watt had no incentive to defend the actions of Secretary Andrus unless he thought that they were correct. Thus, to the extent that the present program imitates the prior program it is not a reflective defensive gesture, but the result of an original appraisal. Therefore, the jaundiced view which courts sometimes take of an agency determination which remains largely the same after remand is not in order in the present case.

Keeping these two points in mind we turn to an analysis of each of the main contentions raised by petitioners, concluding that none of them undermines the validity of the five year program.

## III. Precise Indication of the Size and Location of Leasing Activity

Section 18(a) directs the Secretary to prepare a leasing program which consists "of a schedule of proposed lease sales indicating, *as precisely as possible, the size, timing, and location of leasing activity.*" [24] In *Watt I* the court did not "attempt to define ... the degree of exactitude compelled by section 18(a)," [25] because the Secretary conceded that greater specificity was possible, and, in fact, had employed greater specificity in designating other proposed sales scheduled for the waters off California.[26]

However, the court recognized that in requiring the Secretary to specify the location of leasing activity "as precisely as possible," section 18 "implicitly recognizes that absolute precision is unobtainable at the program stage." [27] The purpose of the precision requirement is to notify interested parties of the areas on which leasing activi-

---

22. *Id.* at 1303 (footnote omitted).

23. For example, the Secretary's primary error with respect to the evaluation required by section 18(a)(2) was that he mistakenly felt that the statute did not require him to consider fully all of the factors at the program level. *See id.* at 1305–07. Similarly, the Secretary's analysis under section 18(a)(2)(B) was flawed mainly because the Secretary "interpreted the term 'environmental risk' contrary to the plain meaning of the statute." *Id.* at 1308. Finally, the primary deficiency in the Secretary's section 18(a)(3) analysis was his failure to "con-

sider and factor in all aspects of section 18(a)(2)," *id.* at 1318, a defect directly attributable to the Secretary's misinterpretation of section 18(a)(2).

24. 43 U.S.C. § 1344(a) (Supp. V 1981) (emphasis added).

25. *Watt I,* 668 F.2d at 1304.

26. *Id.*

27. *Id.*

ty will occur. Since the Secretary does not know exactly which areas will be leased, he is required only to specify "as precisely as possible," or, to put it another way, to reveal his full intentions at that time. He must inform interested parties of the areas which he is genuinely considering for leasing activity. If he is considering offering an entire area in one lease, the Secretary must include that as a single sale on the program. If, on the other hand, the Secretary has already determined that an area will be leased at two separate times he cannot lump the two together as one sale under the five-year leasing program. The Secretary, acting on his own geological survey data, designates planning areas as part of a five-year leasing program, which he will make more specific after further data in response to his call comes in. This common-sense interpretation of section 18(a) repudiates petitioners' main challenge to the manner in which the Secretary complied with the precision requirement.

■ Petitioners contend that the program is insufficiently precise because each entire planning area is scheduled as one lease sale even though the Secretary has indicated that it is likely that only a portion of each area will actually be leased.[28] However, this argument misses the mark because, although the Secretary concedes that it is likely that only a portion of any particular planning area will be leased, he is unable at this time to determine which portions will or will not be leased. Section 18(a) requires the Secretary to designate areas of leasing activity only "as precisely as present information supports."[29] At the time the leasing program was adopted the Secretary knew only that leasing activity could occur in any portion of each planning area and indeed perhaps in all portions of any particular planning area. On the basis of that information the Secretary properly

designated entire planning areas as possible lease sales.

Petitioners argue that the Secretary cannot defer beyond the program stage the decision of which areas to lease, apparently concluding that the Secretary must designate at the program stage which tracts will actually be leased. This argument ignores the structure of section 18(a). Section 18(a) is, as noted above, pyramidic in structure. Greater specificity is anticipated at each stage. Before an area is actually put up for sale, other steps must be taken, including an evaluation of the potential environmental and coastal zone effects under the National Environmental Policy Act and the Coastal Zone Management Act and state concerns under section 19 of the Outer Continental Shelf Land Act.[30] Doubtless, these evaluations, when considered in conjunction with the expressed interest of the industry and certain portions of the planning area, may result in a paring down of the size of the tracts actually offered for lease. However, at this point the Secretary intends to offer the entire area as one sale. He has thus indicated as precisely as present information supports the size and location of areas which will be offered for leasing activity.

■ Petitioners attack the precision of the leasing program in three other respects. These attacks are also unavailing. Petitioners first contend that the Secretary has violated section 18(a) because the size of the planning areas designated on the proposed lease sale schedule are vastly larger than under the Andrus program.[31] However, section 18(a) does not require the Secretary to limit the size of a planning area to any specific acreage. It only requires the Secretary to indicate as precisely as possible the size of the areas on which leasing activity

28. Brief for Petitioners' States of California, State of Alaska, Natural Resources Defense Council, North Slope Borough, and Cenaliulrit at 36–37 [hereinafter referred to as California Brief].

29. *Watt I,* 668 F.2d at 1304.

30. 43 U.S.C. § 1345 (Supp. V 1981).

31. California Brief at 33–34. Petitioners note that the largest offering in the history of the offshore leasing program comprised 2.9 million acres, *id.* at 34 n. 1, while the present program includes one planning area of 133 million acres.

will occur. Since the Secretary is considering offering a lease which includes the entire planning area, he can designate the entire planning area as one proposed lease regardless of its size.

Second, petitioners claim that the Secretary has violated section 18(a) by unlawfully delegating to the members of the oil industry the designation of the areas which will actually be leased.[32] This is in reality a challenge to the leasing procedure which Secretary Watt adopted to implement the later stages of the offshore oil development program. Secretary Watt determined that, in light of the dismal record of exploration on the outer continental shelf, a new procedure was needed to enhance the possibility of major oil and gas finds. Thus, a new procedure was adopted. Under the new procedure the five year program sets out entire planning areas which will be considered for leasing. Prior to the call for information, one of the early steps in the new pre-sale process, the Department of Interior will identify the portions of the planning area which it believes have potential for discovery of commercial deposits of oil and gas. The identified portions will then be announced in the call. With the issuance of the call for information, the entire planning area will be open for consideration and the call will request information about the entire area. In response to the call, industry, states and other parties may suggest further areas of potential interest within or beyond those identified by the department but within the planning area. Following the call, states and others will also have an opportunity to comment on areas or topics of concern which should be considered in the planning for the lease sale. Using the responses to the call and other available data, the Secretary will approve the areas to be proposed for leasing. These areas will be analyzed in the sale-specific environmental impact statement. The proposed notice of sale will then include the defined area.

■ Petitioners' argument that the Secretary has unlawfully delegated the identification of tracts for sale to the oil industry is in reality a challenge to this new procedure adopted by the Secretary, but we reject that attack. It is not unreasonable for the Secretary to seek input from the industry before proceeding to the exact designation of which tracts will be offered for sale. Indeed, in light of the pyramidic structure of the statute it would be surprising if the Secretary did not at least consider the possibility of narrowing down the size of the proposed lease sales, and input from industry is one factor which can reasonably be considered when that decision is made.

■ Finally, we note that the Secretary complied with this court's order in *Watt I* that he change the California sale designation. In the latest program the broad California planning area is divided into two planning areas, Southern California and Central and Northern California.[33] In addition, several other changes were made which resulted in greater specificity. For example, the designation of sales 90 and 96, previously identified as Atlantic, were changed to South Atlantic and North Atlantic, respectively. Sale 100, in South Alaska, was divided into three smaller sales. And the North Atlantic planning area was restored to its prior status as two planning areas.[34] We therefore find no merit in petitioners' contention that the present five year program is less precise than the program reviewed by this court in *Watt I*.

32. California Brief at 39–40.

33. We also reject petitioners' contention that the Secretary was required to separate the Central and Northern California lease sale into two distinct sales. Petitioners argue that the Secretary had, in an earlier sale, divided the area into two sales and that accordingly a more precise offer was possible. However, the Secretary has never divided the Central and Northern area into two planning areas. What petitioners refer to is the Secretary's decision to delete four basins from a sale in the area to permit further review. Respondents' Brief at 28. This in no way indicates that there will be two sales there in the *future*. The Secretary did not limit himself to such a course by separating a portion of the area for further consideration.

34. Respondents' Brief at 19–20.

Accordingly, we hold that the Secretary has complied with the precision requirement of section 18(a).

## IV. COMPLIANCE WITH SECTION 18(a)(2)

Section 18(a)(2) directs the Secretary to prepare the five-year leasing program consistent with the principle that "timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer continental shelf shall be based on a consideration of [eight enumerated factors]."[35] In *Watt I* the court rejected the Secretary's argument that he did not need to consider each of these eight factors at the program level.[36] The court held that section 18(a)(2) imposed a two-fold duty on the Secretary. First, "the Secretary [must] consider all factors listed in section 18(a)(2) in developing the leasing program."[37] Second, he "must base the leasing program upon the result of his consideration of these factors."[38]

■ In an effort to comply with this dual obligation the Secretary, on remand, engaged in a six-step process to determine the timing and location of the leasing activity. First, he reviewed the results of a comparative analysis of planning areas prepared by the Interior staff and examined the conclusions which could be drawn from that analysis. All of the factors included under section 18(a)(2) which in the view of the Interior staff were subject to quantification were incorporated in this comparative analysis. Second, the Secretary considered the extensive comments received on the comparative analysis. Third, using the results of the analysis and the comments, initial conclusions were reached about the location and timing of the leasing activity, basing priority on a calculation of net social value for each planning area. Fourth, the section 18(a)(2) considerations which were not sub-

jected to quantitative analysis or which were not incorporated in the net social value estimates, including more explicit consideration of the relative environmental sensitivity and marine productivity than was possible in the quantitative analysis, were reviewed in order to determine whether any of the initial conclusions should be modified. Fifth, after making the adjustments required by review of each of the factors listed in section 18(a)(2), the Secretary grouped the areas into three categories: those areas which should be leased on an annual basis, those which should be leased on a biennial basis, and those which should be leased only on a triennial basis. Finally, these groups were used to develop a schedule of proposed lease sales which became the five year program.[39] After reviewing the Secretary's analysis and methodology, we conclude that he has met the obligation imposed upon him by section 18(a)(2).

### A. *Consideration of the Section 18(a)(2) Factors*

There is no dispute that Secretary Watt made an effort to consider all of the factors enumerated in section 18(a)(2). In this respect the present case is different from *Watt I* in which the Secretary erroneously interpreted the statute in a manner which relieved him of the responsibility of considering all of these factors at the program stage. Petitioners in the present case challenge the *adequacy* of the consideration, not the fact that the consideration was made. This lessens the level of our scrutiny.

Petitioners' challenge focuses on section 18(a)(2)(B), which requires that the Secretary consider "an equitable sharing of developmental benefits and environmental risks among the various regions,"[40] and section 18(a)(2)(G), which requires the Secretary to consider "the relative environmental sensitivity and marine productivity of dif-

---

**35.** 43 U.S.C. § 1344(a)(2) (Supp. V 1981). The eight factors the Secretary must consider are listed at TAN 12.

**36.** *Watt I,* 668 F.2d at 1304–05.

**37.** *Id.* at 1305.

**38.** *Id.*

**39.** Joint Appendix (JA) at 2300–08.

**40.** 43 U.S.C. § 1344(a)(2)(B) (Supp. V 1981).

ferent areas of the outer Continental Shelf." [41] We find the Secretary's analysis sufficient under both sections.

### 1. Section 18(a)(2)(B).

Petitioners contend that the Secretary's section 18(a)(2)(B) analysis is inadequate because it did not evaluate regional benefits and environmental risks on a planning area basis but rather on the basis of regions composed of states and groups of states.[42] Petitioners contend that this arbitrary definition of "region" flawed the section 18(a)(2)(B) analysis in two respects. First, the Secretary's consideration of states or aggregations of states masked the disproportionate share of risks borne by particular planning areas because it spread those risks out over a larger area. Second, the Secretary's method prevented him from considering section 18(a)(2)(B) in any meaningful manner because the results were not comparable with other section 18(a)(2) factors which were measured on a planning area basis. These attacks are meritless, however, because they do not accurately reflect what the Secretary did in considering section 18(a)(2)(B).

The Secretary specifically noted that "[e]stimates of both developmental benefits and environmental risks have been calculated *on a planning area basis.*" [43] Thus, petitioners err when they contend that the Secretary evaluated the sharing of the developmental benefits and environmental risks only on a statewide basis.[44] The portion of the Secretary's analysis which petitioners attack is the Secretary's examination of the distribution of risks and benefits among the *people* who would be affected by oil and gas

development. This was the second step the Secretary took under section 18(a)(2)(B). After noting that estimates of the benefits and risks had been calculated on a planning area basis, the Secretary observed that the manner in which those benefits would be shared by the population on shore "is not as obvious." [45] The Secretary recognized the common-sense proposition that the planning area itself, which is a portion of land lying under the ocean, does not benefit from development in any quantifiable sense. The Secretary thus *went on* to consider the relative distribution of risks and benefits among the people outside the planning areas who would be affected by oil and gas development in the various regions. He therefore *went beyond* what was required by the statute. The selection of these coastal regions was not, as petitioners claim, an arbitrary aggregation of planning areas into states or groups of states, but a legitimate attempt by the Secretary to consider on a quantified, reasonable basis, the distribution of benefits and risks from leasing in the planning areas among the coastal populations likely to be impacted by the development. This additional evaluation was made on a state by state basis since it is the state government which has the most prominent role in representing these people under the Outer Continental Shelf Lands Act.[46] We refuse to penalize the Secretary for going beyond what the statute requires.

### 2. Section 18(a)(2)(G).

Petitioners contend that the Secretary's 18(a)(2)(G) analysis is inadequate because the Secretary limited his consideration of relative environmental sensitivity and ma-

---

**41.** 43 U.S.C. § 1344(a)(2)(G) (Supp. V 1981).

**42.** California Brief at 115.

**43.** JA at 1278 (emphasis added).

**44.** The fact that the Secretary analyzed each *planning area* under § 18(a)(2)(B) is further evidenced by petitioners Washington and Oregon's argument that they were harmed because "the Secretary chose ... to consider the section 18(a)(2) factors only as they applied to the Department of Interior's designated 'planning

areas.'" Brief for Petitioners Washington and Oregon at 5. *See also id.* at 20. Thus, different groups of petitioners attack the Secretary's § 18(a)(2) analysis on contradictory grounds. Both attacks are misplaced, however, because as noted in text the Secretary analyzed the section 18(a)(2) factors on *both* a planning-area and state-wide basis.

**45.** JA at 1278.

**46.** *See, e.g.,* 43 U.S.C. §§ 1344(a)(2)(F), (c), (f), 1345 (Supp. V 1981).

rine productivity exclusively to the impact from major oil spills. Petitioners claim that the Secretary's failure to consider other important types of impacts such as direct disturbance from support operations, offshore platform installment and operations, intentional discharges of drilling muds, cuttings, and produced waters from drilling operations, and chronic, small discharges of oil into the environment, was arbitrary. Thus, they argue, the Secretary's section 18(a)(2)(G) analysis was inadequate. However, we find this argument unpersuasive.

In *Watt I* this court noted that "[t]he statute provides no method by which environmental sensitivity and marine productivity are to be measured." [47] The statute requires only that the Secretary "make a good faith determination of the relative environmental sensitivity and marine productivity of the various regions based upon the best 'existing information' available to him." [48] The Secretary was therefore free to chose any methodology "so long as it is not irrational." [49] He has met this requirement.

The Secretary admitted that "[a] number of factors could be considered in ranking the environmental sensitivity of the OCS planning areas.... The sensitivity of those resources to the various aspects of OCS development, such as oil spills, structure placement, discharges and air emissions could also be considered." [50] However, he decided to base the relative environmental sensitivity rankings on the sensitivity of the various coastal and marine habitats to oil spills only and explained his reasons for doing so.

[C]onsideration of habitat sensitivity was confined to the sensitivity to oil spills because spill effects are considered by many experts to be the greatest measurable biological effect of OCS development. Furthermore, some non-spill effects are localized and highly dependent on site-specific factors, and therefore have limited value for comparing entire planning areas. Finally, sensitivity to some environmental effects of OCS development is almost impossible to evaluate without considering the expected level of OCS activities—*i.e.*, it is difficult to establish a consensus definition of sensitivity. [51]

In essence the Secretary explained that oil spills were the greatest measurable effect on the environment and that other factors could not adequately be considered on the basis of available evidence. Since section 18(a)(2)(G) requires a comparative analysis, [52] the Secretary reasonably limited his consideration to the impact having the largest and most wide-spread effect on the environment. The relative environmental sensitivity and marine productivity can rationally be evaluated on that basis. It is important to remember that the program stage is the most general stage of the offshore leasing process. Consideration of specific environmental impacts on an area-by-area basis can be made as the program moves to the leasing, exploration, and development stages.

Petitioners also attack the Secretary's section 18(a)(2)(G) methodology in a different manner. The Secretary determined that the relative environmental sensitivity and marine productivity analysis could be performed by dividing each area into various coastal and marine habitats. Thus, in each area the coastal habitats were divided into beaches (including barrier islands), wetlands (including marshes and tundra), rocky shores (including cliffs), and lagoons (Alaska only). [53] The marine habitats in

47. *Watt I*, 668 F.2d at 1311.

48. *Id.* at 1313.

49. *Id.* at 1320.

50. JA at 1256.

51. *Id.*

52. Under section 18(a)(2)(G), the Secretary must consider the "*relative* environmental sensitivity and marine productivity of different areas." (emphasis added).

53. JA at 1257.

each area were divided into aquatic beds, submarine canyons, reefs and hard bottoms.[54] Petitioners contend that these classifications are not comprehensive, that major fish spawning, nursery, and feeding habitats are habitats which the Secretary did not consider in his study, and that the Secretary's failure to include these important habitat types and his selection of habitats for analysis on no articulated rationale violates this court's order in *Watt I.*[55] Again, however, petitioners' argument ignores important portions of the Secretary's decision.

The Secretary stated that he examined environmental sensitivity on a habitat basis because this allowed "all OCS areas to be analyzed according to common factors, avoiding the difficulty of weighing and comparing very different resources in different planning areas."[56] He explained his failure to consider some of the habitat types urged by petitioners, noting that such a procedure "would result in overlap—for example, wetlands often act as nursery grounds."[57] The Secretary therefore evaluated the relative environmental sensitivity and marine productivity of the various areas on a basis which he reasonably determined would result in the most reliable comparison. While it is possible to argue that there may have been a better methodology for evaluating these factors, we are unable to conclude that the Secretary's choice was irrational. Accordingly, his consideration of the factors outlined in section 18(a)(2)(G) was adequate.[58]

### B. *Basing the Leasing Program on the Section 18(a)(2) Factors*

As noted above, the Secretary must not only consider the section 18(a)(2) factors, he must "base the leasing program upon the result of his consideration of these factors."[59] This requires the Secretary to use the section 18(a)(2) analysis in two ways. First, the Secretary must determine that none of the section 18(a)(2) factors pose an "absolute or categorical impediment to leasing a particular area."[60] Second, the Secretary must use the information gathered in considering the section 18(a)(2) factors when performing the balancing analysis required by section 18(a)(3).[61] We conclude that the Secretary has complied with these requirements.

Petitioners advance three arguments in support of their contention that the Secretary has not based the leasing program on a consideration of the section 18(a)(2) factors. The first two are easily disposed of. The Petitioners first contend that the program could not have been based on a consideration of the section 18(a)(2) factors since that consideration was inadequate. Since we have already determined that the Secretary's consideration of all the section 18(a)(2) factors was in fact adequate there is no merit to this argument. Petitioners next contend that the Secretary unlawfully refused to adjust the timing of the various lease sales to reflect the results of his consideration of the section 18(a)(2) factors. This argument is also meritless.

Contrary to petitioners' implication, the Secretary did make adjustments after con-

---

**54.** *Id.*

**55.** California Brief at 131.

**56.** JA at 1256.

**57.** *Id.*

**58.** We also reject petitioners' contention that the Secretary erred in considering safety considerations and mitigation measures in deciding whether to alter the leasing schedule in response to his section 18(a)(2)(G) analysis. California Brief at 146–58. As we noted in *Watt I,* "the potential for environmental harm cannot be adequately considered and weighed without a like examination of the potential to mitigate such harm." 668 F.2d at 1317.

**59.** *Watt I,* 668 F.2d at 1305.

**60.** *Id.* at 1313.

**61.** *Id.* at 1315 n. 117. Thus, in *Watt I* the Secretary's primary shortcoming with respect to section 18(a)(3) was his "failure to consider and factor in all aspects of section 18(a)(2). This omission precluded him from meeting the requirement of section 18(a)(3) to obtain a proper balance to the maximum extent practicable." *Id.* at 1318.

598

sidering each of the section 18(a)(2) factors. For example, as a result of his section 18(a)(2)(B) analysis, the Secretary adjusted the schedule to accommodate the views of the State of Alaska. At the time of the decision on the tentative proposed final leasing program it was decided to delete sale number 75—North Aleutian Basin— and to delay leasing in Hope Basin for two years.[62] The section 18(a)(2)(B) analysis also resulted in changes to planning areas in the Gulf of Mexico. Two sales were eliminated (103 and 106) in the Eastern Gulf of Mexico, a frontier area with the lowest social values among the Gulf areas. The two remaining proposed sales in that area (sales 79 and 94) were scheduled on a biennial rather than annual basis.[63] As a result of the Secretary's analysis under 18(a)(2)(E),[64] the Secretary initially decided to propose more frequent offerings in St. George Basin, North Aleutian Basin, and Norton Basin than would be derived solely from the net social value rankings.[65] On the basis of section 18(a)(2)(F),[66] the Secretary decided to divide the North Atlantic into two separate planning areas, North Atlantic and Mid-Atlantic, and to add one sale (111) in order to provide for biennial leasing in the Mid-Atlantic planning area.[67] Petitioners contend that more adjustments should have been made as a direct result of the Secretary's consideration of section 18(a)(2) factors. However, this court's earlier opinion required the Secretary only to consider whether the factors constituted an absolute or categorical impediment to leasing in a particular area and then to use those factors as part of the balancing process in determining the timing and location

of the leasing activity. Petitioners may have struck the balance in a different manner, but they have failed to show that the Secretary's decision was arbitrary or unlawful.

Petitioners' final attack on the adequacy of the Secretary's efforts to base the leasing program on the section 18(a)(2) factors is more troubling. Petitioners point out that while the Secretary utilized the section 18(a)(2) factors as a basis for determining the *frequency* of leasing activity in the various areas, the Secretary himself admitted that "the timing of first sales in an area should not be subject to this analysis." [68] Petitioners contend that this is an admission by the Secretary that he failed to base the timing of the leasing program on his consideration of the section 18(a)(2) factors. At first glance petitioners' argument appears to be correct. The Secretary does admit that he did not base the timing of the first sale in each particular area on his consideration of section 18(a)(2) factors. However, the interpretation of section 18 which must be accepted in order to complete petitioners' argument is not sound.

The Secretary's admission that the timing of the first sales in an area would not be subject to the section 18(a)(2) analysis was based on his realization that "as a factual matter offshore leasing does not begin when this program is approved, but rather it began in 1954 when the first Federal lease sale was held." [69] Thus, "[w]ith the exception of several Alaskan areas, the 'first sale' has already been held in each OCS planning area." [70] The Secretary concluded that as a practical matter some sales

62. JA at 2302.

63. *Id.* at 2303.

64. Section 18(a)(2)(E) requires the Secretary to consider "the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination." 43 U.S.C. § 1344(a)(2)(E) (Supp. V 1981).

65. JA at 2305. Other section 18 considerations led to the ultimate decision to provide for biennial leasing only in the St. George Basin. *Id.*

66. Section 18(a)(2)(F) requires the Secretary to consider the "laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration." 43 U.S.C. § 1344(a)(2)(F) (Supp. V 1981).

67. JA at 2306.

68. *Id.* at 2301.

69. *Id.*

70. *Id.*

on the prior schedule must be continued on the revised schedule because presale steps for these sales have been long under way and it would be grossly ineffective to re-schedule these sales for later in the pro-gram. Petitioners contend that this is tan-tamount to basing the timing of the sales *solely* on administrative convenience, some-thing this court rejected in *Watt I.*[71] How-ever, the Secretary's decision to permit these sales to continue was not based solely on administrative convenience, but on the Secretary's interpretation of the *congres-sional intent to expedite* offshore lease sales, particularly in frontier areas.

Congress expressly stated that "leasing shall be permitted to continue" throughout the period necessary for the formulation and reformulation of the leasing program and "for so long thereafter as such program is under judicial or administrative re-view." [72] Further, the 1978 amendments envisioned moving into previously undevel-oped or frontier areas.[73] The adoption of petitioners' interpretation of section 18 would mean that each time the Secretary revised the five year program, he would have to rearrange the schedule and defer sales in low net-social-value areas. The re-sult would be that areas which, although ranking low in comparison to other areas, nevertheless have potentially recoverable oil and gas benefits substantially exceeding expected costs, might never be leased, whereas proven areas would be subject to incessant leasing. This would also aggra-vate the inequitable sharing of environmen-tal risks which presently exists because leasing activity is primarily limited to the proven areas of the Gulf of Mexico and Southern California. Thus, the Secretary's decision to permit some sales to proceed on

schedule, notwithstanding the fact that a consideration of section 18(a)(2) by itself might dictate otherwise, was not based sole-ly on administrative convenience, but on the Secretary's correct belief that other section 18 interests could *also* be considered in de-termining the timing of leasing activity.

The fact that we do not have control over the timing of first sales in most areas does not negate the Department's respon-sibility to schedule those where we do have control on a rational basis, that is, at a point when the Department is prepared to meet its responsibilities under the OCS Lands Act, NEPA, and other applicable statutes. These were, in fact, the pri-mary factors in determining the schedul-ing of first sales.[74]

Similarly, the Secretary quantified what to him seemed possible to quantify, and evalu-ated other factors qualitatively.

We therefore reject petitioners' argu-ment that the program is not based on the Secretary's consideration of the factors list-ed in section 18(a)(2). The Secretary prop-erly concluded that none of these factors precluded him from arranging the schedule as he did and there is no serious dispute over whether these factors were used to strike the proper balance under section 18(a)(3).[75]

## V. THE SECTION 18(A)(3) COST BENEFIT ANALYSIS

Under section 18(a)(3) the Secretary is required to "select the timing and location of leasing, to the maximum extent practica-ble, so as to obtain a proper balance be-tween the potential for environmental dam-age, the potential for the discovery of oil and gas, and the potential for adverse im-

---

**71.** *Watt I,* 668 F.2d at 1314–15 (Secretary can-not base timing of lease sales *solely* on admin-istrative exigencies).

**72.** 43 U.S.C. § 1344(d)(3) (Supp. V 1981).

**73.** *Watt I,* 668 F.2d at 1295.

**74.** JA at 2301.

**75.** Our conclusion concerning section 18(a)(2) completely defeats petitioners' argument that

the Secretary's section 18(a)(3) analysis was flawed due to "[t]he manifest errors in the Secretary's consideration of § 18(a)(2) ... and his failure to base his timing and location deci-sions on these factors." California Brief at 150. Since we conclude that the Secretary's section 18(a)(2) analysis was adequate, his sec-tion 18(a)(3) analysis cannot be faulted on that basis.

pact on the coastal zone." [76] In *Watt I* the court noted that "within the section's 'proper balance' there is some notion of 'costs' and 'benefits,' recognizing that 'costs' in this context must be a term of uncertain content to the extent it is meant to stand for environmental and social costs." [77] The court expressed concern about one aspect of the cost benefit analysis performed in the original five-year leasing program, finding that the Secretary had failed to explain adequately his determination of net economic value, particularly the economic effects of delaying leasing.[78] On remand the Secretary more fully explained the basis of his net economic analysis and engaged in a cost benefit analysis. Petitioners in the present case do not argue that the Secretary failed to engage in the cost benefit analysis, nor do they contend that he failed to explain what he was doing. Instead, they attack several of the factual findings and methodological assumptions at the base of the Secretary's cost benefit analysis. We find these arguments unpersuasive.

It is first important to understand what is being evaluated. As noted above petitioners challenge the factual basis and the methodology used by the Secretary in various aspects of the cost benefit analysis. These are aspects of the analysis which fall within what the court in *Watt I* described as the "frontiers of scientific knowledge." [79] The facts used by the Secretary in performing the analysis are largely predictive in nature, and the methodology utilized was necessarily novel because this type of analysis has not been performed extensively in the past. Thus, as the court in *Watt I*

observed, great deference is afforded to the Secretary in these areas. "Where existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information." [80] Therefore, although we are obligated to review the factual findings of the Secretary in order to determine that they are supported by substantial evidence in the record, we realize that these findings must be somewhat speculative. Further, we are required to sustain the methodology and assumptions made by the Secretary if they are reasonable.

It is also important to realize that because the analysis is speculative and predictive in nature, it could go on forever. However, it is clear that Congress did not want the Secretary to spend years developing a five-year leasing program. Indeed, the Secretary was required to submit the first proposed program to Congress, the Attorney General, and the Governors of the affected states within nine months of the effective date of the 1978 amendments.[81] Thus, "the final decision as to how much analysis is necessary in view of the available data must be the agency's subject to judicial review only for obviously incorrect results or methodology." [82] In sum, the aspects of the Secretary's cost benefit analysis challenged are aspects with regard to which the Secretary is entitled to substantial deference. It is important to keep this in mind, as we evaluate the Secretary's performance under section 18(a)(3).

---

**76.** 43 U.S.C. § 1344(a)(3) (Supp. V 1981).

**77.** *Watt I*, 668 F.2d at 1318.

**78.** *Id.* at 1320–21.

**79.** *Id.* at 1301, quoting *Industrial Union Department, AFL–CIO v. Hodgson*, 499 F.2d 467 (D.C. Cir.1974).

**80.** *Id.* n. 18 (citing *Permian Basin Area Rate Cases*, 390 U.S. 747, 811, 88 S.Ct. 1344, 1383, 20 L.Ed.2d 312 (1968)).

**81.** 43 U.S.C. § 1344(c)(3) (Supp. V 1981). Congress also apparently contemplated the

adoption of a final leasing program within 18 months of the amendment's effective date. *Id.,* § 1344(d)(3). This undermines Petitioner Florida's argument that "a minimum of three years for environmental data collection and one year for data synthesis is needed to have the necessary information to perform an adequate cost/benefit analysis as required by ... (Section 18)." Statement of Petitioner Florida at 3.

**82.** *Watt I*, 668 F.2d at 1317 n. 224, quoting *Massachusetts v. Andrus*, 594 F.2d 872, 886 (1st Cir.1979).

■ The Secretary's cost benefit analysis revolves around a calculation of each planning area's "net social value." Net social value is calculated by subtracting external costs from net economic value.[83] Net economic value in turn is defined as the difference between the market value of the expected hydrocarbon resources in a planning area less the direct costs of producing those resources and transporting them to market.[84] External costs are the "environmental and socio-economic costs which are not normally included in the costs of operations involved in OCS oil and gas exploration, development, production and transportation."[85] Petitioners do not attack the generalized formula used by the Secretary in calculating the net social value of each planning area. Instead, they attack the adequacy of the calculations. However, none of these challenges persuades us that the Secretary's analysis was defective.

### A. Calculation of Net Economic Value

Petitioners first challenge the Secretary's calculation of net economic value. They contend that the Secretary's determination of net economic value was completely inaccurate because it failed to reflect the costs and benefits of delaying lease sales. According to petitioners, the Secretary did not consider the possible benefits or costs of delaying lease sales beyond the first year of the program and therefore his analysis was skewed. However, it is the petitioners' argument which is skewed and therefore unconvincing.

The Secretary in his initial calculation determined net economic value as if all oil in all areas would be leased and developed in the first year of the program.[86] This was reasonable because the Secretary was trying to calculate the *relative* ranking of each of the planning areas, in addition to determining whether each of the planning areas should be leased. Petitioner would have the Secretary initially determine the timing of each lease sale in order to determine when the oil would be developed and then calculate the costs and benefits of leasing at that time in order to determine whether and when each planning area should be leased. Petitioners in effect claim that the measure used to determine the timing and location of lease sales must itself factor into that conclusion the timing of the lease sales. This is an illogical proposition. The Secretary's actions were more reasonable. After calculating the costs and benefits of leasing in each area under the assumption noted above, the Secretary computed the cost of delay for each planning area.[87] Therefore, the Secretary evaluated each area on a relative basis initially and then considered the cost of delay for each planning area. This was entirely permissible.

Petitioners next contend that the Secretary's calculation of net economic value was defective because it was based on two arbitrary assumptions. They first assert that the Secretary unreasonably assumed that the price of oil would increase in real terms at a rate of one percent per year. Second, they complain because the Secretary assumed that the production costs in all planning areas would in real terms remain constant throughout the five year period. We reject both of these arguments.

The Secretary's assumption that the price of oil would increase by one percent per year in real terms is not unreasonable and is supported in the record. The Secretary noted that the one percent rate was consistent with the assumptions the Department of Interior had made in most lease sale designs in the past year, that it was within the low range estimated by a study completed in 1980 comparing seventeen major studies of petroleum price forecasts, and that since the study's completion, world price trends had moderated somewhat, justifying reliance on a somewhat lower long-

---

**83.** JA at 1283.

**84.** *Id.* at 1251.

**85.** *Id.* at 1271.

**86.** *Id.* at 1332.

**87.** *Id.* at 1316.

run trend.[88] Petitioners contend that the study relied upon by the Secretary predicted that the most likely rate of increase would be three percent. This may be true, but the Secretary was free to use his expertise to accept the one percent growth rate which the study stated was within the realm of possibility, particularly in light of recent trends which indicate that many of the earlier studies overstated the rise in the price of oil.

We also find that the Secretary's assumption that production costs in all planning areas would remain constant in real terms throughout the five year period was reasonable. Petitioners contend that the only reasonable assumption was that production costs in frontier areas would decline as technology improved. The Secretary acknowledged that production costs *might* decline in frontier areas. He therefore noted that if that should happen resources of average value in frontier areas would yield greater benefit if produced later. He correctly noted that a two percent decline in costs in such areas would narrow the differences in net economic value between programs with earlier and more frequent leasing in such areas and programs which were less aggressive. However, he concluded that such differences were not sufficient to require adjusting the schedule because it was likely that resources of above average value would be discovered and produced first in such areas, at a time when the cost of production was still high. He further stated that the market was capable of anticipating technological developments better than the government and that, accordingly, the market would delay investments whenever greater profits could be achieved. The Secretary's assumption was therefore reasonable, and we conclude that he adequately considered changes in production costs in frontier areas.[89]

## B. Calculation of External Costs

Petitioners also challenge the Secretary's calculation of external costs, raising three particular challenges to this aspect of the Secretary's cost benefit analysis. They first contend that the Secretary understated the cost of potential oil spills because no effort was made to determine whether the oil spills studied by the Secretary would have a similar effect in each of the planning areas. Second, they contend that the Secretary failed to count the cost of oil spills of less than a thousand barrels and that this resulted in a serious understatement of the costs. Third, they contend that the Secretary arbitrarily assumed that cleanup costs for oil spills would be the same in all regions. We find each of these arguments unpersuasive.

In determining the cost of major oil spills (oil spills greater than a thousand barrels) the Secretary relied on the most reliable information available, a study evaluating damage estimates for the only five oil spills which had been subjected to economic analysis.[90] The Secretary threw out the high and low values, converted the remaining values to 1981 dollars, and arrived at a range of $100 to $1900 per barrel for the

88. *Id.* at 1334–35.

89. We also reject petitioners' contention that the Secretary's net economic value determination was defective because (1) it ignored production cost differences among planning areas, (2) it was based on an assumption that recoverable gas resources would be produced in Alaska and delivered to market, and (3) it was based on a tax rate which was not supported by the record.

The tax rate chosen by the Secretary had no effect on the net economic value determination, because the Secretary added back into the analysis the exact amount of taxes deducted earlier—48%. The amount of the assumed tax rate therefore had no impact on the analysis. The Secretary's assumption on the economic feasibility of producing gas in Alaska could reasonably be drawn from evidence in the record. JA at 1242–43, 1254. Moreover, the Secretary considered the effect of an error in this assumption. *Id.* at 1254–55. Similarly, his assumption on the production costs in different areas was reasonably based on Department of Interior experience in many areas, supplemented by a Department of Energy Report which was especially helpful in determining the costs in frontier areas. *Id.* at 1328.

90. JA at 1461.

cost of the cleanup for major oil spills.[91] The Secretary then assumed that this range would be the lower and upper limits of environmental damage caused by oil spills in any one of the planning areas. Finally, the Secretary evaluated each planning area to determine where, within that range, the area would fall.[92]

Petitioners contend that the Secretary did not adequately consider the differences between the environments in the planning areas under review and those in which the oil spills in the study occurred and that as a result the range used by the Secretary was too restrictive. They claim that the Secretary should have engaged in additional analysis to determine whether the environments of the coasts where the oil spills occurred were similar to those of each planning area. However, we find the Secretary's method reasonable. It was reasonable to base the range of estimates on actual events which had been quantified in the past. This range was based on a study of the only five major oil spills which the Secretary felt provided reliable evidence. Petitioners can cite no major oil spills which the Department did not consider. The Secretary's methodology was far from irrational, and we have been provided no more reasonable alternative.

Petitioners' complaint about the Secretary's failure to quantify the costs of oil spills of less than a thousand barrels is also misdirected. Petitioners intimate that the Secretary completely failed to consider the costs of oil spills of less than a thousand barrels and that this understated the external costs. However, petitioners ignore the methodology chosen by the Secretary. The Secretary did not base his entire section 18(a)(3) analysis on the cost benefit analysis. Instead, he considered the quantifiable costs in the cost benefit analysis and then

later considered costs which he determined could not be quantified.[93] The Secretary specifically noted:

> there were several suggestions that the cost of spills under 1000 barrels should be calculated since they may inflict damage equal to or higher than that of spills over 1000 barrels. These and similar recommendations raise issues which are subject to much debate and disagreement.... [A] number of external costs were not estimated due to the difficulty of establishing values on which there is little consensus. The Department believes these costs exist, but are more appropriately considered in other terms than dollars.[94]

We do not think it was arbitrary for the Secretary to consider the cost of these oil spills in terms other than dollar and cents, particularly when the record before him contained very little reliable evidence on which the calculation could be based.[95]

We also reject petitioners' contention that the Secretary acted arbitrarily in assuming that the cleanup costs for each region would be the same. The Secretary did not identify regional cost differences in oil cleanups. However, his refusal to do so was reasonable. The Secretary noted that, for purposes of the cost benefit analysis, he chose to assume that cleanup costs would not vary from region to region because "it is difficult to identify what the regional cost differences might be, and [further] location, type, and size of spill [will] be the primary factors" in determining the costs of oil cleanup.[96] Petitioners claim that this assumption was arbitrary because it can be proven that the cost of cleanup in the Arctic environment would be much higher than in other areas. They cite one study to support this contention, a study showing that cleanup costs for three oil spills off

**91.** *Id.* at 1487.

**92.** *Id.* at 1486.

**93.** *Id.* at 1271.

**94.** *Id.* at 2314.

**95.** The evidence available to the Secretary indicated that the average oil spill under 1000 bar-

rels was only 1.2 barrels. JA at 2495. This shows that the potential impact of such oil spills would be minimal and further justifies the Secretary's decision to consider those impacts in terms other than dollars.

**96.** JA at 1469.

Alaska's coast ranged from $321 to $32,347 per barrel, figures far higher than the range used by the Secretary.[97] However, the higher figure, which is the only figure outside the range of oil cleanup costs considered by the Secretary, could have rationally been rejected by the Secretary since it was based on a very small oil spill[98] which was not shown to be typical. Further, the wide range of the costs in the cited study only underscored the Secretary's conclusions that it would be extremely difficult to identify what the regional cost differences might be and that other factors, which had been considered, would more accurately reflect the actual costs.

## C. Methodology for Calculating Costs and Benefits

Petitioners final attack on the Secretary's cost benefit analysis is directed toward the methodology used by the Secretary. They contend that the entire analysis is flawed because the Secretary did not measure costs and benefits on the same basis. Petitioners argue that in calculating the net economic value of each area the Secretary did not discount to present value the estimated benefits from oil production. On the other hand, petitioners assert, the Secretary did discount to present value the external costs associated with that development. The result, petitioners conclude, is either an overstatement of benefits or an understatement of costs which is so great that the entire five year program is flawed. However, petitioners overstate the magnitude of the Secretary's error and, more importantly, ignore the Secretary's overall procedure which rendered that error insignificant.

The Secretary's calculation of net economic value was based on a formula involving three factors: (1) the estimated residual value per barrel of oil (the value of the oil after taxes and royalties are paid); (2) the taxes received by the government as a result of development; and (3) the royalties received by the government.[99] What petitioners fail to acknowledge is that the Secretary did discount to present value the estimated residual value per barrel of oil. The Secretary expressly stated that the residual value represented the "net *present* value which is the residual left after royalties and taxes have been paid."[100] Thus, one of the three factors was discounted to present value before it was included in the calculation. Since taxes were calculated into the formula in terms of percentage rather than dollars,[101] and since percentages (unlike dollars) do not change in value over time, there is no need to discount the second factor to present value. Therefore, the only factor which was not discounted to present value was the amount the government would receive in royalty payments.

Petitioners contend that even if the Secretary failed to discount only the royalty factor, the resulting miscalculation is still so large that the entire program is unsupportable. We reject that argument because it ignores the overall process the Secretary utilized in promulgating the five year program. Petitioners' argument implies that the Secretary felt that his cost benefit anal-

---

97. California Brief at 89.

98. The per barrel cost of cleaning up extremely small spills does not accurately reflect the average cleanup cost because "as the number of barrels spilled increases, the dollar cost of cleanup per barrel decreases. In the case of a small [spill], all the cost of mobilization of [equipment] is incurred, even though not many barrels of oil need to be collected or contained." JA at 1468.

99. The following formula was used by the Secretary to determine net economic value:

$$\text{Net economic value} = \text{Residual Value} + \frac{5.8}{.52}$$

The equation considered the effects of taxes at a 48% rate $(1 - .48 = .52)$ and royalties of $\frac{1}{6}$ ($\frac{1}{6}$ of $35 (the estimated market price of oil in the first year of the program) = 5.8). JA at 1328.

100. JA at 1327. (emphasis added). The Secretary noted that most economic models calculated residual value in this manner and that "[f]or purposes of this analysis the net economic value per barrel of resource was calculated by finding *this* residual value per barrel in each area and extrapolating to the net economic value." *Id.* at 1327–28. (emphasis added).

101. *See supra* note 98.

ysis was so exact that he could rely on it exclusively in determining when and where leasing activity would occur. This is simply not the case. The Secretary's cost benefit analysis was far from precise and he knew it. Accordingly, he made adjustments to allow for errors in his calculation and was cautious as to the extent he relied on his analysis. When the Secretary's failure to discount royalties to present value is viewed in light of the overall scheme, its significance lessens dramatically.

The Secretary's cost benefit calculations were not as precise as they could have been, since they were slanted in favor of lower benefits and higher costs. This is not to say that they were erroneous. The Secretary merely realized the uncertainty inherent in such predictions and he made allowances to give him room for error. For example, the Secretary deliberately overstated costs to an extent, noting that "when judgments were needed on the dollar value to use for damages on how an area's environmental resources should be rated, the practice was *always* made to err on the high side." [102] The Secretary also observed that he could have justifiably used lower cost figures. "[E]stimates of expected external costs are likely overstated [because] development of the United States' OCS oil and gas resources is conducted in an exceedingly safe and environmentally sound manner." [103] Similarly, benefits were consciously understated. For example, the Secretary noted:

> The estimates of net economic value did not include any estimate of the benefits from reduced requirements for the Strategic Petroleum Reserve due to higher production levels. The net economic benefits are thus understated by 5% to 10%.

In addition, the estimates of net economic value did not include any allowance for "premium" value of domestic oil production above the value set by the world price. Such a premium may result from decreased vulnerability to import disruptions. Such estimates range from a few dollars to nearly $100 per barrel, but there is substantial uncertainty as to their validity. By neglecting these benefits of decreased economic disruption that accrue from import disruptions when domestic price is higher, the net economic value estimates again understate the potential national benefits of OCS oil and gas production. [104]

We are not suggesting that the Secretary's error with respect to the calculation of royalties was exactly offset by these other assumptions. We merely intend to show that the Secretary allowed room for such errors. More importantly, the Secretary realized that the cost benefit analysis should be used only for generalized conclusions. [105] He did not think that the analysis would provide an adequate basis for making narrow distinctions between planning areas. Petitioners do not suggest that the error with respect to royalties would have resulted in the deletion of any area from the program. They assert only that had royalties been discounted to present value, the rankings of six of the nine planning areas would change. [106] The Secretary was aware that his analysis might be flawed in some respect so he took steps to allow room for just such errors and was careful to limit the manner in which he used the resulting calculations. Thus, while the Secretary's calculations may have been more precise had he discounted the royalties to present value, we do not think this minor error flawed the

---

102. JA 1278. (emphasis added).

103. *Id.*

104. *Id.* at 1332.

105. For example, the Secretary noted that the cost portion of his analysis should be used only for very general conclusions.

> Given the uncertainty of the data on which the analysis was based, and the necessity of heavy reliance on judgment and opinion, the external cost estimates should be considered, at best, as an order of magnitude approximation. As such, prudent use of these estimates would only make distinction between differences from area to area if they are approximately an order of magnitude in size (that is, one estimate is more than or less than 10 times the other).

*Id.* at 1277.

106. Petitioners' Supplemental Memorandum concerning the Royalty Issue at 2.

entire five year program so as to require a remand.

In summary, petitioners challenge the Secretary's cost benefit analysis on a variety of fronts. However, they fail to recognize the limited scope of our review. Too often they attempt to prove that the Secretary's decision is not supported by evidence in the record by citing evidence which conflicts with the Secretary's conclusion. They ignore the evidence which supports the Secretary's decision or claim that it is not as persuasive as the evidence to which they cite. However, as this court recently noted

> Disagreement among the experts is inevitable when the issues involved are at the "very frontiers of scientific knowledge," and such disagreement does not preclude us from finding that the Administrator's decisions are adequately supported by the evidence in the record.... It is not our function to resolve disagreements among the experts or to judge the merits of competing expert views.... Our task is the very limited one of ascertaining that the choices made by the Administrator were reasonable and supported by the record.... That the evidence in the record may also support other conclusions, even those that are inconsistent with the Administrator's, does not prevent us from concluding that his decisions were rational and supported by the record.[107]

On the basis of all the evidence before him the Secretary's cost benefit analysis was reasonable. Even if we disagreed with some of the conclusions he reached, we would be unable to remand the program on that basis.

## VI. Receipt of Fair Market Value—Section 18(a)(4)

In addition to the principles stated in subsections 1, 2 and 3 of section 18(a), the Act requires that the five-year leasing program accord with the principle that "[l]easing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the federal government."[108] The term fair market value is not defined in the statute, so the Secretary adopted the following definition for purposes of his analysis.

> "Fair market value" is defined as the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obligated to buy.[109]

Petitioners do not attack this definition, but they do contend that the program adopted by the Secretary does not assure receipt of fair market value. We must reject their contention once again.

Petitioners assert that the large size of the lease offerings and the accelerated rate of leasing combine to drive the prices of the leases down.[110] However, even assuming that lower bids will result, petitioners have not established that the Secretary violated the Act.

Section 18(a)(4)'s requirement that the program assure receipt of fair market value does not mandate the maximization of revenues, it only requires receipt of a fair return. The Secretary acknowledged that the accelerated rate of leasing might ordinarily result in less intense competition and lower bids for some tracts. He pointed out, however, that the contrived intensity of competition achieved by the government's prior use of its monopoly power may have produced prices in excess of fair market value and thus not socially optimal.

**107.** *Lead Industries Association v. EPA,* 647 F.2d 1130, 1160 (D.C.Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).

**108.** 43 U.S.C. § 1344(a)(4) (Supp. V 1981).

**109.** JA at 1355.

**110.** Petitioners particularly emphasize the accelerated rate of leasing, contending that "[i]f more and more tracts are offered, bids will be submitted based on less and less information. Uncertainty will increase. As uncertainty over the value of the resource increases, expected profits from the lease decrease and, as expected profits decrease, the willingness to pay of the prospective bidder decreases." California Brief at 154 n. 1.

[The] monopolistic tendencies of past leasing rates raise the possibility that lease prices were at least somewhat higher as a result. The question now is, what is the effect from the perspective of fair market value of increasing the rate of leasing in order to catch up on the amount of investment in exploration? Lease prices could be held at higher levels by continuing to restrict the availability of leases. Such a policy could result in prices that would be higher than those in a market in which supply is competitively determined. It would, however, be tantamount to exertion of monopoly power by the government. Losses to the economy would result just as they do from private monopolies. It would be very costly to the Nation to exercise the government's monopoly over the supply of OCS leases as the means for assuring receipt of fair market value. Other means are available that are far less costly to the nation's economy.[111]

Thus, rather than attempt to maximize the amount of money the government could receive by delaying the sale of leases, the Secretary decided to rely on the competitive bidding process to assure receipt of fair market value, concluding that that process did "much to assure that the bids the government receives represent the value of the leases under the supply and demand conditions at the time of the lease sale."[112] This conclusion was a reasonable one.

The process for receiving bids on leases is not an open public auction but a competitive sealed bid procedure under which none of the bidders knows what its competitors will bid. The Secretary observed that there was evidence that one and two bid lease sales have not yielded surplus profits to their owner, and that such leases have not been made at less than fair market value.[113]

As added insurance that fair market value would be received on tracts with modest prospects, the Secretary increased the minimum bid per acre from $25 to $150.[114] Thus, the Secretary's heavy reliance on the competitive bidding process to assure receipt of fair market value was not unreasonable.

Moreover, the Secretary did not rely exclusively on the competitive bidding process to assure that fair market value would be received. As a double check, the Secretary adopted evaluation procedures designed to assure further the government's receipt of fair market value. Petitioners contend that these procedures are not sufficient, noting that they are less comprehensive than the tract evaluation previously used. However, we cannot conclude that these procedures are unreasonable or that they will not assure the receipt of fair market value, particularly when they are viewed merely as a complement to the effect of the competitive bidding process.

Under the prior evaluation procedure, each tract put up for lease was evaluated by the government to determine what minimum price should be bid in order to assure receipt of fair market value. The Secretary noted that this was not the most effective way of assuring the receipt of fair market value because evaluations were often made on tracts for which no bids were received. In an effort to avoid the costly and unnecessary task of estimating the value of tracts which would not be leased, the Secretary, observing that the tract evaluation system was best viewed as a mechanism to deter any tendency for bidders to exploit unusual situations or new conditions by systematically underbidding, attempted to design a cost effective sample of tracts for evaluation. Although the program is apparently still in the testing phase,[115] the general out-

111. JA at 1361.

112. *Id.*

113. *Id.* at 1359.

114. *Id.* at 2298.

115. The Secretary asserts that the "new" tract evaluation procedure is merely a proposal, which will not be implemented until tested. "Until a system is validated it will not be implemented, and the prior procedures will continue to be utilized." Respondents' Brief at 97. Petitioners dispute this representation, but do not suggest that the procedures have been implemented. Petitioners' Reply Brief at 72. We do not need to resolve the dispute, because we

608

lines laid down by the Secretary are adequate to assure that the evaluation system will perform its function to assure that the government receives fair market value for its leases.

Under the proposed program the tract evaluation will be made *after* bids are received. Each high bid will be subjected to a quantitative evaluation developed to decide whether to accept or reject bids and, when validated, to a comparative evaluation. Bids passing this initial screening will then be evaluated on the following basis. Bids received on leases containing proven, drainage, or development tracts will *all* be evaluated. Bids received for frontier areas will be evaluated in two ways. First, an appropriate sample of the tracts receiving bids, depending on the particular sale, but generally in the range of thirty percent, will be evaluated. Second, a *random* sample of five percent of the tracts will be evaluated.[116] This system will adequately allow the Secretary to deter bidders from subverting the market system and will do so in a cost-effective manner. There may be more effective means available, as petitioners assert, but that does not mean that the chosen method is unreasonable. Therefore, the proposed evaluation process, coupled with the Secretary's reasonable reliance on the integrity of the competitive bid process, is sufficient to assure that the fair market value is received.[117] The statute requires nothing more.

## VII. Effects of the Five Year Leasing Program on Washington and Oregon

Petitioners Washington and Oregon contend that the Secretary failed adequately to consider the effects of the five-year leasing program on their states. In particular they contend that the Secretary's analysis with respect to the impact of the program on Washington and Oregon was so inadequate that it violated section 18(a)(1) and section

18(a)(2) of the OSCLA and section 102 of the National Environmental Policy Act. We reject all of these arguments.

A. *Compliance With Section 18(a)*

Washington and Oregon challenge the adequacy of the Secretary's section 18(a) analysis in two respects. First, they contend that section 18(a)(1) and section 18(a)(2) require the Secretary to evaluate each region of the outer continental shelf even if no leasing activity is contemplated there and that the Secretary failed to do this. However, this argument is flawed because it is based on an erroneous interpretation of section 18.

■ Section 18 does not require the Secretary to engage in the fruitless exercise suggested by Washington and Oregon. The purpose of the Secretary's section 18 analysis is to determine which areas will be leased under the five-year leasing program and when those areas will be leased. If the Secretary has already determined that no leasing activity will occur in a particular area there is no need to fully evaluate that area. Thus, if the Secretary adequately considered the costs to Washington and Oregon associated with the leasing in other areas he has not violated the statute.

Washington and Oregon next assert that the Secretary's analysis is inadequate because he did not adequately consider the effect of oil spills from Alaska and Northern California which could impact on Washington and Oregon. We disagree. There is no dispute that the Secretary expressly took into account the impact on Washington and Oregon in his consideration of section 18(a)(2)(B)—arriving at a quantified estimate of 300 million dollars.[118] Washington and Oregon complain because these costs were largely attributable to the costs of potential oil spills from oil tankers from Alaska. They argue that the Secretary ig-

find both the "old" and the "new" tract evaluation procedures sufficient when considered in conjunction with the reasonable reliance on the market and the increased minimum bid price, to assure receipt of fair market value.

116. JA at 2298.

117. *Id.* at 2294.

118. *Id.* at 1282.

nored other potential costs, including the cost associated with spills from other sources and the cost of damage to fish and wildlife. However, these concerns are not well-founded.

█ It is undisputed that the Secretary considered the costs of oil spills from Alaska and California and concluded that most of the damage would be inflicted on those two states. Oregon and Washington contend that more of the impacts will occur in Oregon and Washington because of the northward flow of the Davidson current during the winter months. However, even if the Secretary erred in deciding *where* these costs would occur, his analysis is still sustainable as long as he adequately considered *how much* the costs would be. Washington and Oregon dispute this conclusion, asserting that the accuracy of the Secretary's determination of *where* the impacts will occur is important because their shores are different in terms of environmental sensitivity from those of California. However, the Secretary reasonably concluded that "the ecological damages for Washington and Oregon would be expected to be similar to those of Central and Northern California." [119] This is a rational assumption, especially in light of the fact that neither Washington nor Oregon presented the Secretary with any information to the contrary, despite their opportunity to do so. Thus, we conclude that the Secretary's evaluation of the impacts on Washington and Oregon comported with the requirements of section 18(a).

### B. *Compliance with NEPA*

█ Section 102 of the National Environmental Policy Act (NEPA) requires all agencies of the federal government to include in their recommendations for major federal actions significantly affecting the quality of the human environment, a detailed statement of "the environmental impact of the proposed action [and] any adverse environmental effects which cannot be avoided should the proposal be implemented." [120] Washington and Oregon challenge the environmental impact statement prepared for the five year program, contending that it inadequately considered the program's environmental impact on Washington and Oregon.[121] The focus of Washington and Oregon's concern is the Secretary's failure to consider the effect of potential oil spills on the Washington and Oregon environment.[122] However, we find the Secretary's evaluation of the environmental impact of such oil spills adequate.

The supplemental environmental impact statement which was filed as a part of the five year program expressly discusses the effect of oil spills on the Pacific region of which Washington and Oregon are a part. It explains in detail the effects of a spill on fish in this region, including the stocks of concern to Washington and Oregon: salmon, herring, steelhead trout, shrimp, and crabs.[123] It also evaluated the effect of an oil spill on tourism and recreation in the region, concluding that "loss to both beach and water recreation would be very high for the area where any large oil spill contacted." [124] And, the Secretary also *considered* the possibility that support bases would be built in Washington and Oregon,[125] even though he concluded that "the number and location of new facilities are dictated by a number of marketing factors making it extremely difficult to accurately predict or assess the impacts of new facilities." [126]

Washington and Oregon may have hoped that the Secretary would perform a more extensive evaluation of the effect of the

---

**119.** *Id.* at 1488.

**120.** 42 U.S.C. § 4332(B)(i) & (ii) (1976).

**121.** Brief for Petitioners Washington and Oregon at 25 [hereinafter Washington Brief].

**122.** Washington Brief at 30–31.

**123.** Final Supplemental Environmental Impact Statement (FSEIS) at 480–87, 533–37.

**124.** *Id.* at 501.

**125.** *Id.* at 469.

**126.** *Id.* at 886.

five year program on their states. However, they were provided with an opportunity to review and comment upon the draft supplement to the environment impact statement and failed to raise many of the issues they seek to raise now. Those·which they raised were adequately addressed, even though the Secretary's conclusions did not conform with those of Washington and Oregon. The environmental impact statement was therefore adequate.

### VIII. COMPLIANCE WITH SECTION 18(f)(5)

Washington and Oregon advance one final attack on the five-year leasing program. They contend that the program violates section 18(f)(5) because the Secretary did not expressly declare when he would make the consistency determination which Washington and Oregon contend is required by section 307 of the Coastal Zone Management Act.[127] As do all of the arguments advanced by petitioners in this case, this argument falls short.

 Section 18(f)(5) requires the Secretary "by regulation, [to] establish procedures for ... *consideration* of the coastal zone management program being developed or administered by an affected coastal state pursuant to section [*305 or 306* of the Coastal Zone Management Act of 1972.]"[128] There is no indication that the Secretary must outline when a section 307 *consistency determination* must be made. Indeed, there is some question as to whether a consistency determination is ever required under the leasing program.[129] The section merely requires the Secretary to establish *procedures* for the *consideration* of the coastal zone management program developed by the states pursuant to section 305 or 306. In conformity with this requirement the Secre-

tary issued a regulation requiring that "information concerning the relationship between a state's coastal zone management program and OCS oil and gas activity shall be requested from the Governors of the effected coastal states and from the Secretary of Commerce prior to the development of the proposed leasing program at the time information is requested under [section 18(a)(2)(G) ]"[130] This clearly meets the requirement of section 18(f)(5).

Washington and Oregon contend that the legislative history of section 18(f)(5) indicates that the Secretary is required to explain when the consistency determination will be made. However, we read the legislative history to the contrary. Washington and Oregon's argument would have been stronger if Senate bill 9, the 1977 Senate bill, would have been passed. That version of section 18(f)(5) required

> The Secretary [to], by regulation, establish procedures for ... (5) coordination of the program with the management program being developed by any State for approval pursuant to section 305 of the Coastal Zone Management Act of 1972 and *consistency,* to the extent practicable, with the management program of any state which has been approved pursuant to Section 306 of such Act.[131]

However, the House version differed from the Senate version, and the conference committee adopted the House version, stating:

> Both versions provide for regulations as to coastal zone management applicability. The House amendment provides for regulations involving *"consideration"* of a program "being developed or administered" pursuant to section 305 or 306, respectively, of the Coastal Zone Act. The Senate Bill provides for "coordina-

**127.** 16 U.S.C. § 1456(c)(1) (1976).

**128.** 43 U.S.C. § 1344(f)(5) (Supp. V 1981) (emphasis added).

**129.** In *California v. Watt,* 683 F.2d 1253 (9th Cir.1982) *cert. granted,* —— U.S. ——, 103 S.Ct. 2083, 77 L.Ed.2d 295 (1983), the Ninth Circuit held that the Secretary is required to issue a consistency determination under section 307 of the CZMA before actually selling oil and gas

leases under section 19 of the OCSLA. The Secretary sought review of that decision, contending that section 307 does not apply to such *sales* because the *sales* do not directly affect the coastal zone.

**130.** 43 C.F.R. § 3310.4 (1982).

**131.** S.Rep. No. 95–284, 95th Cong., 1st Sess. 16 (1977) (emphasis added).

tion" of the program with the management program being developed *and also for "consistency" to the extent practicable with the management program.* The conference report is the same as the House amendment. The Secretary is to establish procedures by regulation for consideration of state coastal zone management programs.[132]

Thus, the version of section 18(f)(5) which was ultimately adopted required the Secretary merely to establish procedures for *considering* the programs being developed or administered by the states pursuant to section *305 or 306* of the Coastal Zone Management Act. It did not require him to outline when a consistency determination under section 307 would be made.

IX. CONCLUSION

The Secretary's second attempt to promulgate a five-year leasing program successfully complied with the requirements of the Outer Continental Lands Act as interpreted by this court in *Watt I.* Petitioners' all-out attack on this program is not well founded.[133] Petitioners' disagreement with the conclusions reached by the Secretary are not a sufficient basis for us to invalidate the program. The Secretary's decision was reasonable and supported by the evidence in the record to the extent required by section 18. Accordingly, the petitions are dismissed and the Secretary's five year program is upheld.

---

**132.** S.REP. No. 95–1091, 95th Cong., 2d Sess. 105 (1978) (emphasis added).

**133.** Petitioner Florida's argument that some leasing off its shores should be halted because it has "not been assured that its recommendations [concerning two lease stipulations] have been or will be adopted," Brief for Petitioner Florida at 8, is premature. Nothing in section 18 requires the Secretary to decide what stipulations will be included in individual leases be-

fore he approves the five year program. The House Report on the 1978 amendments recognized that the selection of lease stipulations occurs mid-way through the overall process. H.R.REP. No. 95–590, 95th Cong., 1st Sess. 63 (1977). If the Secretary refuses to include the stipulation in the leases when the leases are drafted, Florida can seek review of that decision.