# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 6, 2025          Decided August 29, 2025

No. 24-1024

HEALTHY GULF, ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
RESPONDENTS

AMERICAN PETROLEUM INSTITUTE,
INTERVENOR

---

On Petition for Review of a Final Action
of the Department of the Interior

---

*Brettny E. Hardy* argued the cause for Environmental Petitioners. With her on the briefs were *Danika Desai*, *Christopher D. Eaton*, *Devorah Ancel*, *Julia K. Forgie*, *Melanie Calero*, and *Thomas Zimpleman*.

*Sean Marotta*, *Danielle Desaulniers Stempel*, *Keenan Roarty*, and *Dana A. Raphael* were on the briefs for petitioner American Petroleum Institute.

*Victoria S. Nugent* and *Emma R. Leibowitz* were on the brief for *amicus curiae* Greater New Orleans Interfaith Climate Coalition in support of Environmental Petitioners.

*Elizabeth Neville* was on the brief for *amicus curiae* American Society of Mammalogists in support of Environmental Petitioners.

*Andrew R. Varcoe*, *Stephanie A. Maloney*, *Corinne V. Snow*, and *Kevin A. Moscon* were on the brief for *amicus curiae* the Chamber of Commerce of the United States of America in support of petitioner American Petroleum Institute.

*Christopher Anderson*, Attorney, U.S. Department of Justice, argued the cause for respondents. On the brief were *Todd Kim*, Assistant Attorney General, at the time the brief was filed, and *Justin D. Heminger* and *Jacob D. Ecker*, Attorneys.

*Sean Marotta* argued the cause for respondent-intervenor American Petroleum Institute. With him on the brief were *Danielle Desaulniers Stempel*, *Dana A. Raphael*, and *Keenan Roarty*.

*Julia K. Forgie*, *Thomas Zimpleman*, *Melanie Calero*, *Devorah Ancel*, *Brettny Hardy*, *Danika Desai*, and *Christopher D. Eaton* were on the brief for environmental respondent-intervenors.

*Jennifer Danis* was on the brief for *amicus curiae* the Institute for Policy Integrity at New York University School of Law in support of respondents.

*Deborah A. Sivas*, *Matthew J. Sanders*, and *Amanda D. Zerbe* were on the brief for *amici curiae* Members of Congress, et al. in support of respondents.

Before: HENDERSON, CHILDS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*:  Offshore drilling has long stood at the uneasy intersection of national energy demand, ecological vulnerability, and environmental justice.  Extracting oil and gas from beneath the ocean floor offers astonishing returns but carries equally extraordinary risks.  Spills, seismic disruption, and cumulative pollution imperil delicate ecosystems, while frontline communities along the coast continue to shoulder a disproportionate share of the harms.  Notwithstanding the risks, the energy industry presses forward, drawn by the promise of tapping into the vast reserves buried offshore.  That pursuit depends on the federal government's decision to lease access to the seafloor for oil and gas production.

By now, the Secretary of the Interior is no stranger to petitions challenging when and where she authorizes leasing across portions of the Outer Continental Shelf (OCS) for offshore oil and gas development.  The OCS comprises an enormous, federally managed swath of submerged lands; it extends from the seaward edge of state waters, three nautical miles from the coastline, to the outer boundary of United States ocean jurisdiction, roughly 200 miles offshore.[1]  Beneath its surface lies an estimated 29.4 billion barrels of oil and 391.6 trillion cubic feet of natural gas—enough, by some accounts, to supply America's oil needs for four years and its natural gas needs for approximately twelve years.[2]

---

[1] *See* 43 U.S.C. §§ 1301(a–c), (f), 1331(a).
[2] *See Interior Releases Major Update on Oil and Gas Potential Beneath U.S. Public Lands*, U.S. Dep't of the Interior, (June 18, 2025), [https://perma.cc/W8R3-VSPE].

4

This case marks the sixth time we have been called upon to review a five-year leasing schedule adopted under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.* The 2024–2029 National Outer Continental Shelf Oil and Gas Leasing Program (Program) was prepared, maintained, and approved by the Department of the Interior at the direction of Secretary Debra A. Haaland, in coordination with the Bureau of Ocean Energy Management (BOEM), led by Director Elizabeth Klein (collectively, Interior). The Program authorizes up to three lease sales in the Gulf of Mexico (GOM) region, scheduled for 2025, 2027, and 2029.

Environmental Petitioners are a coalition of eco-friendly nonprofit organizations dedicated to protecting the GOM region and its surrounding communities. To them, Interior's Program violated OCSLA on several fronts. Petitioners contend that Interior inadequately assessed the risks posed on vulnerable coastal communities, excluded the endangered Rice's whale from its environmental sensitivity analysis, overlooked potential conflicts with other present and anticipated ocean uses, and fell short of balancing the Program's projected benefits against its environmental costs. They ask us to remand the Program to Interior for further consideration. The American Petroleum Institute, intervening for Interior, contests whether Petitioners' claims are justiciable.

We hold that Petitioners have associational standing to pursue their claims. On the merits, however, we find no basis to disturb the Program. OCSLA demands that Interior consider a set of interrelated statutory factors and weigh competing costs and benefits of oil and gas leasing across OCS regions. That standard does not insist upon analytical perfection at every turn, but it does demand reasoned decision making. The record before us, though in parts raises eyebrows, ultimately satisfies that threshold. We therefore deny the petition for review.

5

**I.**

We have on several occasions examined OCSLA's statutory framework in reviewing prior leasing programs. *See, e.g.*, *Ctr. for Sustainable Econ. v. Jewell (CSE)*, 779 F.3d 588, 593–96 (D.C. Cir. 2015) (challenging the 2012–2017 Program); *Ctr. for Biological Diversity v. U.S. Dep't of Interior (CBD I)*, 563 F.3d 466, 472–74 (D.C. Cir. 2009) (challenging the 2007–2012 Program); *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 291–93 (D.C. Cir. 1988) (challenging the 1987–1992 Program); *California v. Watt (Watt II)*, 712 F.2d 584, 588–89 (D.C. Cir. 1983) (challenging the 1982–1987 Program); *California v. Watt (Watt I)*, 668 F.2d 1290, 1295–99 (D.C. Cir. 1981) (challenging the 1980–1985 Program). Our evaluation of this Program proceeds against the backdrop of those decisions. In this iteration, we begin by outlining the statutory provisions that govern this case and guide our analysis.

**A.**

Congress enacted OCSLA in 1953, granting the Secretary of the Interior broad authority to lease and regulate oil and gas development of the OCS's mineral resources. *See* Outer Continental Shelf Lands Act, Pub. L. No. 83-212, 67 Stat. 462 (1953). That authority came with few procedural or substantive guardrails, leaving little guidance on how to evaluate the Secretary's decisions. *See CSE*, 779 F.3d at 593 (citing *Watt I*, 668 F.2d at 1295). In the following two decades, the OCS saw the largest oil spill in U.S. history and a foreign oil embargo, prompting President Richard Nixon to order the leasing of 10 million acres. *See Watt I*, 668 F.2d at 1295. That expansion fueled concerns about harm to coastal communities, disruption of fisheries, and degradation of marine ecosystems. *Id.* at 1295–96.

Congress addressed those concerns in 1978, overhauling OCSLA to impose a structured, transparent, and sequential framework that must be completed before drilling begins. *See* Pub. L. No. 95–372, 92 Stat. 629 (1978) (codified at 43 U.S.C. § 1331 *et seq.*); *Watt I*, 668 F.2d at 1296–97. That framework, "pyramidic in structure," unfolds in four stages—program (preparation), leasing, exploration, and development—each progressively narrower in scope as activity moves closer to resource production. *CBD I*, 563 F.3d at 473 (quoting *Watt I*, 668 F.2d at 1297); 43 U.S.C. §§ 1337(a), 1340, 1344, 1351.

Petitioners challenge the Secretary's decisions at the "program" stage of the 2024–2029 Program. At this stage, the Secretary must prepare "a five-year schedule of proposed leases and related planning steps." *CSE*, 779 F.3d at 594 (citing 43 U.S.C. § 1344). The Program must specify "as precisely as possible, the size, timing, and location of leasing activity" that the Secretary determines "will best meet national energy needs" for the ensuing five-year period. 43 U.S.C. § 1344(a). In preparing the Program, the Secretary must adhere to four statutory provisions—three of which are central to this case.

First, the Secretary must consider the "economic, social, and environmental values of the renewable and nonrenewable resources," the "potential impact of oil and gas exploration on other resource values," and the "marine, coastal, and human environments." *Id.* § 1344(a)(1). Second, the Program must be based on statutory factors that consider the "[t]iming and location of exploration, development, and production of oil and gas" across the OCS's "physiographic regions." *Id.* § 1344(a)(2). As relevant here, these include, but are not limited to: "existing information concerning the geographical, geological, and ecological characteristics of such regions," the "equitable sharing of developmental benefits and environmental risks among the various regions," "the location

of such regions with respect to other uses of the sea and seabed, including fisheries . . . and other anticipated uses of the resources and space" of the OCS, "the relative environmental sensitivity and marine productivity of different" OCS areas, and the "relevant environmental and predictive information for different areas" of the OCS. *Id.* §§ 1344(a)(2)(A), (B), (D), (G), (H). Finally, the Secretary must, "to the maximum extent practicable," select the timing and location of leasing to achieve "a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone."[3] *Id.* § 1344(a)(3).

**B.**

On July 3, 2017, Interior initiated the process of developing a new Program by soliciting public input. *See* 82 Fed. Reg. 30,886/6 (July 3, 2017). Six months later, Interior released its Draft Proposed Program (DPP) and scoping for the Programmatic Environmental Impact Statement (EIS). J.A. 371. In July 2022, Interior released a Proposed 2023–2028 Program and a Draft PEIS. J.A. 25–101. The DPP considered a range of ten lease sales in the GOM region,[4] and one lease sale in the Cook Inlet region of Alaska. J.A. 30–31. Across the three planning documents, Interior received nearly three million public comments. J.A. 371.

---

[3] At the program stage, the Secretary must also ensure that leasing activities are conducted to "assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." *Id.* § 1344(a)(4). Petitioners do not challenge that requirement.

[4] Although now redesignated as the "Gulf of America," 90 Fed. Reg. 8,629/0 (Jan. 31, 2025), we use the terms "Gulf of Mexico" or "GOM" consistent with the administrative record.

On September 29, 2023, Interior transmitted the Proposed Final Program to the President and Congress. J.A. 1754. Interior then released the 2024–2029 Proposed Final Program and Final EIS. J.A. 142–1114. On December 14, 2023, Interior issued a Record of Decision adopting the Proposed Final Program. J.A. 1754–57. The Program schedules three lease sales in the GOM region: Sale 262 in 2025, Sale 263 in 2027, and Sale 264 in 2029. J.A. 149, 1269, 1756. Leases are eligible for sale across the Western, Central, and a small portion of the Eastern GOM Planning Areas. *See* 88 Fed. Reg. 67,798/9 (Oct. 2, 2023). No Alaska sales are scheduled. *Id.*

On February 12, 2024, Environmental Petitioners and the American Petroleum Institute (API), each timely petitioned for review of Interior's approval of the 2024–2029 Program. On April 18, 2025, Interior announced its intent to develop a new leasing program, though it left the 2024–2029 Program in effect while the process to develop a successor program unfolds.[5] API moved for voluntary dismissal of its petition but remained an intervenor for Interior. We granted the motion.

On July 4, 2025, Congress enacted legislation directing Interior to conduct "a minimum of 30 region-wide oil and gas lease sales" in the GOM region by 2040, in addition to any lease sales under the 2024–2029 Program. One Big Beautiful Bill Act (BBBA), Pub. L. No. 119–21, § 50102(a)(1), (A), 139 Stat. ___ (2025). The BBBA further requires Interior to "hold not fewer than 1 lease sale in the [GOM] region . . . by December 15, 2025," *id.* § 50102(a)(1)(B)(i), and "not fewer than 2 lease sales in that region in each of calendar years 2026 through 2039," *id.* § 50102(a)(1)(B)(ii).

---

[5] *See Interior Announces Eleventh National Outer Continental Shelf Oil and Gas Leasing Program*, U.S. Dep't of the Interior (Apr. 18, 2025), [https://perma.cc/9KRQ-RSUN].

**II.**

We first address standing, a constitutional prerequisite to the exercise of our jurisdiction. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Petitioners invoke associational standing on behalf of their members, who assert "recreational, economic, scientific, health, and aesthetic" interests in the GOM waters impacted by the Program. Pet'rs' Reply Br. 14–21. Petitioners are traditional membership organizations with discrete, stable missions tethered to environmental protection. Pet'rs' Add. 42–213. They submitted declarations detailing how the Program will harm their members' use and enjoyment of affected areas.[6] *See id.* That showing is sufficient to establish their eligibility for associational standing because once "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023)).

API argues that Petitioners failed to identify at least one "member who would have standing individually." Resp't-Intervenor's Br. 10–17. Notwithstanding API's protestation to the contrary, Petitioners have standing. To establish associational standing, Petitioners must show that (1) at least one of their members would have standing to sue in their own right, (2) the interests the members seek to protect are germane to their organizations' purposes, and (3) neither the claim

---

[6] We evaluate Petitioners' declarations as evidence to show that "those persons or entities are actually members of [P]etitioner's association and how the challenged agency action affects them." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021).

asserted, nor the relief requested requires the members to participate individually in the lawsuit. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior (CBD II)*, 144 F.4th 296, 305 (D.C. Cir. 2025) (citing *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1032 (D.C. Cir. 2023)).

Petitioners satisfy the first requirement: one member has individual standing. Article III standing requires an individual to show "(1) she has suffered an 'injury in fact' that is concrete and particularized, and actual or imminent rather than conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *CSE*, 779 F.3d at 596 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Members must "aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *CBD II*, 144 F.4th at 305 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 183 (2000)).

Petitioners submit several declarations, including one from Robert Wiygul, who attests to a recreational and aesthetic injury resulting from increased oil and gas activity under the Program and asserts that his injury is likely to be redressed by a favorable decision. Pet'rs' Add. 161–83. Mr. Wiygul is a current member of the Sierra Club, a founding member of Healthy Gulf, a longtime Gulf Coast resident, and a recreational fisherman. *Id.* at 162–64 ¶¶ 4–7. He attests that he has fished in the GOM for decades, including in the OCS, the Mississippi Sound, Fort Bayou, and the Main Pass region. *Id.* at 164 ¶ 7. By his account, he fishes inshore weekly, visits Mississippi's Barrier Islands monthly, conditions permitting, and fishes in OCS waters at least annually. *Id.*

According to his declaration, the "damage done" from previous oil and gas leasing incidents has already injured his recreational interests. *Id.* at 164–68 ¶¶ 8–10. As for now, he identifies specific lease blocks made available under the Program that, upon release, has harmed or will imminently harm his "favored fishing and recreating spots," *id.* at 180–81 ¶ 27 & Fig. 17, directly injuring his "recreational and aesthetic interests." *Id.* at 182 ¶ 29. Those alleged harms are concrete and particularized, not conjectural or hypothetical. Mr. Wiygul attests that "OCS oil and gas leasing and the resulting drilling and production" has impacts that "may be felt at long distances from the lease blocks or wells themselves." *Id.* at 173 ¶ 17. API questions whether Mr. Wiygul will fish again this year or in "five-plus years," Resp't-Intervenor's Br. 11 & n.2, but Mr. Wiygul states that he has a consistent history of fishing and intends to "continue going out" to the OCS and "the barrier islands about twelve miles off the coast of Mississippi in the immediate future."[7] Pet'rs' Add. 164 ¶ 7, 168 ¶ 12; *cf. Jibril v. Mayorkas*, 20 F.4th 804, 815 (D.C. Cir. 2021). That proximity and sustained connection suffices to establish an injury-in-fact.

Causation and redressability are likewise satisfied. As we have previously held, "[a] leasing program that used incomplete economic analyses that failed rationally to account for leasing's impact on the environment would harm their concrete economic and aesthetic interests, and their alleged harm would be redressed were we to invalidate the Program."

---

[7] At oral argument, Petitioners explained that seismic survey activity spurred by the Program's release would immediately impair their members' ability to observe marine species, including the Rice's whale. *See* Oral Arg. Tr. 4:21–125, 5:1–4. "For purposes of standing, the court assumes the validity of the [P]etitioner[s'] claims." *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).

*CSE*, 779 F.3d at 596–97 (citing *CBD I*, 563 F.3d at 479). Mr. Wiygul's longstanding use of the GOM, his stated plans to continue doing so, and his detailed account of how increased leasing will impair his enjoyment mirror the showing in *CSE*. *See id.* His injuries are fairly traceable to the challenged Program and are redressable by a decision setting it aside. Pet'rs' Add. 182–83. Mr. Wiygul's declaration establishes a causal connection between the Program's adoption, anticipated offshore drilling, and environmental harm that threatens his continued use and enjoyment of affected areas. *See CBD I*, 563 F.3d at 478–79. Petitioners thus satisfy the first requirement.

Petitioners also meet the second requirement of associational standing: the interests they seek to protect are germane to their organizational purpose. Germaneness requires "pertinence between litigation subject and organizational purpose," *CSE*, 779 F.3d at 597 (quoting *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)), and serves a "modest yet important" function: ensuring that courts are not drawn into disputes "as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Id.* (citation omitted). The record confirms, and API does not contest, that protecting GOM communities' health and natural resources aligns with Petitioners' mission. Pet'rs' Add. 133.

Finally, Petitioners satisfy the third requirement: the participation of individual members is not required. "Member participation is not required where a 'suit raises a pure question of law' and neither the claims pursued, nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *CSE*, 779 F.3d at 597. Petitioners challenge Interior's compliance under OCSLA and seek vacatur. Neither the claims asserted, nor the relief sought

depends on individualized evidence from their members. *See id.* Accordingly, Petitioners have associational standing.

**III.**

This Court has exclusive jurisdiction to review the petition. 43 U.S.C. § 1349(c)(1). "We liberally defer to the agency's findings of fact, upholding facts supported by substantial evidence; we review the agency's policy judgments to ensure that they are neither arbitrary nor irrational; and we sustain the agency's interpretation of its authorizing statute so long as we find it to be legally permissible." *CSE*, 779 F.3d at 600. Though we defer to agency policy making and fact finding, statutory interpretation remains within our province. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

Petitioners argue that Interior approved the 2024–2029 Program without first conducting an adequate evaluation of the environmental consequences that leasing activity would have in the GOM region. In their view, Interior's analysis fell short under three statutory directives: the Program must reflect a holistic assessment of economic, social, and environmental values, including impacts on other resource uses and the "marine, coastal, and human environments," 43 U.S.C. § 1344(a)(1); must be based on planning factors tied to the "[t]iming and location" of oil and gas activity, *id.* § 1344(a)(2); and must weigh leasing benefits against environmental and coastal risks to achieve a proper balance, *id.* § 1344(a)(3). To them, Interior's treatment of environmental justice, the endangered Rice's whale, and conflicts with other uses fails to satisfy the planning and balancing obligations set out in Sections 18(a)(2) and (3) of OCSLA. We address each in turn.

14

**A.**

Section 18(a)(2) of OCSLA requires the Secretary to base the "[t]iming and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the [OCS]" on a defined set of statutory considerations. *Id.* § 1344(a)(2). Petitioners contend that Interior did not fulfill its obligations under five provisions of Section 18(a)(2): (A), (B), (D), (G), and (H).

**1.**

For many shoreline communities along the Gulf Coast, the harms of offshore oil and gas development are not just hypothetical, they are felt every day. Often, minority and low-income communities live near refineries, gas plants, and petrochemical sites built over decades of leasing. Residents face high exposure to pollution, serious health risks from flaring and runoff, and growing danger from storms and land loss worsened by climate change. These harms are compounded by the daily disruptions of drilling, including traffic, noise, discharges, and visible infrastructure.

Federal efforts to confront these challenges fall within the broader framework of environmental justice. For more than thirty years, Executive Orders have directed agencies to identify and mitigate the "disproportionately high and adverse human health or environmental effects" of federal programs on minority and low-income populations. Exec. Order No. 12,898, 59 Fed. Reg. 7,629/9 (Feb. 16, 1994). A more recent directive defines environmental justice to include:

> (b) the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in agency decision-making

and other Federal activities that affect human health and the environment so that people:

(i) are fully protected from disproportionate and adverse human health and environmental effects (including risks) and hazards, including those related to climate change, the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers; and

(ii) have equitable access to a healthy, sustainable, and resilient environment in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices.

Exec. Order No. 14,096, Revitalizing Our Nation's Commitment to Environmental Justice for All, 88 Fed. Reg. 25,251/3 (Apr. 26, 2023).

To briefly detour, in supplemental filings following the petitions for review, the parties brought to our attention a series of Executive Orders issued in early 2025 that revoked the orders underlying Petitioners' environmental justice claims. In late January, President Donald Trump issued Executive Orders revoking both Executive Order 12,898, and Executive Order 14,096. *See* Exec. Order No. 14,173, 90 Fed. Reg. 8,633/4 (Jan. 31, 2025) (revoking EO 12,898); Exec. Order No. 14,148, 90 Fed. Reg. 8,237/0 (Jan. 28, 2025) (revoking EO 14,096). A third Executive Order further directs that agencies "shall adhere to only the relevant legislated requirements for environmental considerations and any considerations beyond these requirements are eliminated." Exec. Order No. 14,154, 90 Fed. Reg. 8,353/6 (Jan. 29, 2025).

Interior and API contend that these developments defeat Petitioners' arguments in full or render any error harmless. *See* Resp't's Fed. R. App. P. 28(j) Letter at 2 (July 17, 2025); Resp't-Intervenor's Fed. R. App. P. 28(j) Letter at 2 (Apr. 29, 2025). API maintains that the repeal of Executive Orders 12,898 and 14,096 eliminates the legal basis for Interior to consider environmental justice on remand, thereby rendering any analytical flaw moot. *See* Resp't-Intervenor's Fed. R. App. P. 28(j) Letter at 1–2 (Apr. 29, 2025). API further argues that OCSLA does not authorize environmental justice analysis and that, even if it did, the new Executive Orders bar Interior from weighing such considerations going forward. *See id.* at 2.

As to harmless error, Petitioners respond that the issue was not preserved and should not be considered at this stage. *See* Pet'rs' Fed. R. App. P. 28(j) at 1–2 (July 25, 2025). They also maintain that their claims arise under OCSLA itself and do not depend on either rescinded order. *See id.* at 1. Their opening brief similarly anchors the environmental justice arguments in the text and purposes of the statute.

We decline to resolve these disputes over the impact of the new Executive Orders in the first instance. The Orders postdate both the adoption of the Program and the party briefs, and they do not alter our resolution of the case under the law and record in effect when Interior acted. *See City of Port Isabel v. FERC*, 130 F.4th 1034, 1039 (D.C. Cir. 2025) (citing *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 n.2 (D.C. Cir. 2023) (applying law in effect at the time the agency acted)). Whether the new Executive Orders constrain Interior's discretion in future proceedings is not before us. They do not alter our conclusion that, based on the law in force and the record developed at the time, Interior reasonably evaluated environmental justice risks under OCSLA and did not act arbitrarily in doing so.

As to the issues before us, OCSLA imposes binding obligations on the Secretary to consider vulnerable communities. In amending the statute in 1978, Congress made clear that offshore leasing must not proceed without due regard for the communities and environments it affects. One of the stated purposes for the amendment was to "balance orderly energy resource development with protection of the human, marine, and coastal environments." *Watt I*, 668 F.2d at 1296 (quoting 43 U.S.C. § 1802).

Congress's mandate manifests in several provisions. Section 18(a)(2)(B) of OCSLA requires Interior to base the "[t]iming and location" of lease sales on "an equitable sharing of developmental benefits and environmental risks among the various regions." 43 U.S.C. § 1344(a)(2)(B). That directive reflects a judgment that offshore development must proceed with fair consideration of its costs to "marine, coastal, and human environments." *Id.* § 1344(a)(1). Among those costs is the risk of harm to the "human environment[]," which includes "the physical, social, and economic components, conditions, and factors which interactively determine the state, condition, and quality of living conditions, employment, and health" of those affected by activities in the OCS. *Id.* § 1331(i). To meet this mandate, Interior must reasonably evaluate the risks that development may impose on vulnerable communities.

Those statutory commands form the basis of Petitioners' challenge. They argue that continued leasing in the GOM region worsens environmental and health harms for already overburdened communities, and that Interior failed to meaningfully assess whether those risks are shared fairly across regions. To them, Interior neither compared vulnerability levels nor applied any methodology for doing so. Instead, they say, Interior deferred the analysis to later stages, in conflict with its obligation to evaluate those risks at the Program stage.

We find that Interior reasonably evaluated how offshore leasing risks affect vulnerable communities. It acknowledged that the benefits and burdens of OCS activity in the GOM "occur onshore or along the coast," and identified impact-producing factors such as "noise, traffic, routine discharges, bottom and land disturbance, emissions, lighting, visible infrastructure, and space-use conflicts" that may cause "disproportionate and adverse human health or environmental effects" on low-income and minority populations. J.A. 328, 334. Interior also directed readers to a more detailed discussion in the Final Programmatic Environmental Impact Statement. J.A. 334–35. To the extent Petitioners fault the Proposed Final Program document for lacking detail, our review proceeds "solely on the record made before the Secretary," which includes the final environmental documents prepared in support of the Program. *Watt I*, 668 F.2d at 1300 (quoting 43 U.S.C. § 1349(c)(6)).

Petitioners assert that Interior needed to appraise the vulnerability of individual communities in different areas to rationally evaluate how each would respond to harm from leasing. Pet'rs' Br. 23–24. We disagree. Section 18(a)(2)(B) of OCSLA requires Interior to consider whether environmental risks are equitably shared "among the various regions," not to perform a comparative analysis of individual communities. 43 U.S.C. § 1344(a)(2)(B). Petitioners' approach puts the cart before the horse. The granularity of that task would prove unduly burdensome at this early stage of the Program's development. What the statute demands is a reasoned assessment of the potential for harm and the severity of its consequences. *See Watt I*, 668 F.2d at 1308 (citation omitted) (defining "risk" as the "exposure to the chance of injury or loss"). Interior satisfied that obligation.

Interior reasonably assessed the potential for harm and the severity of leasing consequences across the GOM region. It considered ongoing and future burdens across the GOM Program Area, including land loss, industrial development, sea level rise, storm intensification, and pollution. J.A. 614–15. The Program highlighted health disparities near oil and gas processing facilities and acknowledged that vulnerable communities may suffer more severe and longer-lasting harm because they have fewer financial and non-financial resources available. J.A. 616–17. The EIS also incorporated a robust account of how environmental harms may disproportionately affect low-income and minority populations in the GOM. It recounted the lasting impacts of hurricanes and the Deepwater Horizon oil spill on communities living outside Louisiana's levee protection system. J.A. 614. It illustrated the erosion of protective wetlands over the past century through Figure 2-13. J.A. 609–10.

Interior further grounded this analysis in economic and demographic data. It documented high levels of vulnerability in Gulf Coast communities, including average poverty rates of 17.2% in counties bordering the Western and Central Planning Areas, with some counties exceeding 25%. Minority populations in those counties average 61.8%, with some counties, such as Willacy County, Texas, reaching as high as 91.5%. Over 60% of the counties and parishes in those regions exceed the national minority population average of 39.9%. J.A. 614. Interior also explained that overburdened communities are not limited to coastal areas but are spread throughout counties with industrial and environmental links to offshore oil and gas activity. J.A. 615.

In addition, Interior identified intersecting vulnerabilities. It cited studies describing the expansion of infrastructure in coastal areas to support offshore development and its impacts

on vulnerable communities. It noted that coastal erosion and subsidence increase susceptibility to flooding and storm-related hazards, particularly for communities with limited capacity to adapt or recover. J.A. 615. In Louisiana, Interior documented that communities of color were exposed to emissions seven to twenty-one times higher than predominantly white communities. J.A. 614. It also found that Native American and Asian fishing communities in southern Louisiana face heightened risks due to changing environmental conditions. J.A. 615. The record reflects that low-income and minority populations often live closest to industrial facilities and may bear a disproportionate burden from accidents and chemical releases, especially during extreme weather. J.A. 615. Taken together, Interior's analysis represents a reasonable and region-wide appraisal of risk under OCSLA.

Petitioners also argue that Interior failed to compare the vulnerability of communities across the different GOM Planning Areas. Again, the statute does not require such a comparison. Even so, Interior included a regional chart summarizing the impact-producing factors likely to affect vulnerable coastal communities across the Western, Central, and Eastern Planning Areas. J.A. 721. That chart identifies several concerns as potentially significant in the Eastern Planning Area, including noise, traffic, bottom and land disturbance, and visible infrastructure. J.A. 721.

To the extent Petitioners fault Interior for failing to use a specific methodology to compare risks between the Western and Central GOM, that argument misreads the statute. The statute articulates a command of equity, not a calculus for achieving it. The Secretary must ensure "an equitable sharing of developmental benefits and environmental risks among the various regions," 43 U.S.C. § 1344(a)(2)(B), but the statute does not dictate how that assessment must be carried out.

Congress's intent was not to impose mathematical balance, but to ensure that offshore leasing does not concentrate its harms in one region without fair consideration of the resulting burdens. A plain language reading confirms as much.

The statutory term "equitable," as defined in contemporaneous legal sources, meant "[j]ust," "conformable to the principles of justice and right," and "fair, and right, in consideration of the facts and circumstances of the individual case." *Black's Law Dictionary* 632 (Henry Campbell Black ed., rev. 4th ed. 1968). That understanding reinforces that Interior was not required to equalize benefits and risks across all regions. Instead, Interior must make a fair and context-sensitive judgment about those risks in relation to the benefits of leasing. Because OCSLA does not specify a particular metric, that silence grants Interior flexibility in its method, so long as it is reasonable. *Watt I*, 668 F.2d at 1311.

Beyond that, we previously held that "[w]hen reviewing the rationality of Interior's methodological selections, we have looked to, among other factors, whether the methodology has been 'performed extensively in the past.'" *CSE*, 779 F.3d at 611 (quoting *Watt II*, 712 F.2d at 600). Petitioners do not argue that Interior departed from any established formula. We have explained that "[w]here existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information." *Id.* (quoting *Watt II,* 712 F.2d at 600). And "in making timing decisions, Interior is generally 'free to choose any methodology so long as it is not irrational.'" *Id.* (quoting *CBD I,* 563 F.3d at 488).

Here, Interior did not adopt a rigid formula for evaluating the equitable sharing of environmental risks, but it followed a

coherent and historically grounded approach. Interior explained that it is developing methodologies to assess impacts on vulnerable communities at both the national and regional scale, and that it considered a variety of environmental justice tools and frameworks to inform its planning. J.A. 560–61. Although environmental justice impacts are highly localized, Interior included a region-wide analysis at this Program stage by examining whether minority and low-income populations are present in each planning area and evaluating whether proposed leasing may cause disproportionately high and adverse effects. J.A. 561.

That analysis accounted for a range of interrelated cultural, social, economic, and environmental factors that may amplify harm in vulnerable communities. J.A. 561. Drawing on that framework, the regional impact table, J.A. 721, and the socioeconomic analysis of vulnerable coastal communities, J.A. 614–15, reflect Interior's consideration of how environmental justice concerns informed its determination of whether the Program fairly distributes the burdens and benefits of leasing activity.

Finally, Petitioners contend that Interior improperly deferred environmental justice analysis to later phases of the leasing process, despite acknowledging the availability of tools like the EPA's EJScreen and an environmental justice index. Interior explained that those tools would be applied in future NEPA reviews at the regional, lease sale, and project-specific stages, where more granular data becomes available. J.A. 560–61. It noted that pre-lease assessments necessarily rely on modeled scenarios and that the planning period leaves time for local engagement. J.A. 560–61. That staged approach is consistent with both the structure of OCSLA and the tiered review framework. *Watt II*, 712 F.2d at 592. Petitioners offer no basis for concluding that Interior's decision to defer the use

of certain tools, while still conducting a program-level analysis, renders Interior's equitable-sharing determination arbitrary or insufficient. We therefore conclude that Interior satisfied its obligations under Section 18(a)(2)(B).

**2.**

For many, a visit to the Gulf Coast or deeper OCS waters means boating, fishing, or scanning the horizon for marine life. On a lucky day, a boater might glimpse dolphins, sperm whales, or on rare occasion, one of the most endangered great whales in the world, the Rice's whale. J.A. 1708. Long misclassified as the GOM population of Bryde's whale, the Rice's whale was listed as endangered in 2019, and recognized as *Balaenoptera ricei* in 2021, based on new genetic, morphological, and behavioral evidence. Endangered Status of the Gulf of Mexico Bryde's Whale, 84 Fed. Reg. 15,446/6 (Apr. 15, 2019); Technical Corrections for the Bryde's Whale, 86 Fed. Reg. 47,022/4 (Aug. 23, 2021). It inhabits a narrow corridor along the Northeastern continental slope between the DeSoto and Mississippi Canyons, at depths of 100 to 400 meters, spending nights near the surface and days along the seafloor. J.A. 605, 1709–10, 1725, 1734. Fewer than one hundred individuals remain, only half of them sexually mature, and their late maturity, year-round mating, and year-long calf rearing magnify their vulnerability to threats. J.A. 1707, 1710.

The 2010 Deepwater Horizon spill exposed nearly half the population, causing a 22% decline and a projected 69-year recovery. Designation of Critical Habitat for the Rice's Whale, 88 Fed. Reg. 47,453/5 (July 24, 2023); J.A. 1711. With a potential biological removal (PBR) rate of 0.07, the loss of even one whale threatens recovery. J.A. 2126 n.177. Ongoing risks include vessel strikes, oil spills, entanglement, and underwater noise from shipping and seismic surveys, the latter

particularly harmful given the species' reliance on sound for foraging and navigation. J.A. 606–07, 1323, 1710-11. The National Oceanic and Atmospheric Administration has proposed critical habitat covering much of the whale's known range. 88 Fed. Reg. at 47,462.

Petitioners contend that Interior acted arbitrarily by failing to select the Rice's whale as the GOM region's representative marine mammal of conservation importance. In their view, Interior violated Section 18(a)(2)(A) of OCSLA by ignoring peer-reviewed studies, acoustic detections, and federal scientist declarations documenting the species' year-round presence in the Northern, Western, and Central GOM. Petitioners also argue that Interior disregarded the species' proposed critical habitat designation and applied a methodology inconsistent with its prior decision to exclude the whale's habitat from offshore wind leasing areas, violating Section 18(a)(2)(H) of OCSLA. As they see it, those considerations, together with the Rice's whale's rarity, restricted range, and vulnerability, required its designation in the Program's environmental sensitivity analysis under Section 18(a)(2)(G) of OCSLA.

Under OCSLA the Secretary must consider "the relative environmental sensitivity and marine productivity of different areas" of the OCS. 43 U.S.C. § 1344(a)(2)(G). The Secretary must also ground her judgments in the best available facts by considering "existing information concerning the geographical, geological, and ecological characteristics of such regions" and "relevant environmental and predictive information for different areas of the [OCS]." *Id.* § 1344(a)(2)(A), (H). These commands ensure that leasing decisions are based not on conjecture or convenience, but on a record that considers and explains the environmental realities across the GOM region, and the risks faced.

The record contains extensive evidence of Rice's whale occurrences across the GOM, including scientific studies, acoustic detections, federal scientist declarations, and the proposed critical habitat. J.A. 605, 1729, 1751, 1913, 2127–29. Interior acknowledged receipt of this information, stated it would review and update its selected species if necessary, and, in light of public comments and the best available science, determined that "some changes in selected species were warranted." J.A. 317, 901, 943. Not quite for Rice's whale.

Interior reasonably explained that it declined to select the Rice's whale as the GOM's representative marine mammal because the species remained almost exclusively confined to the Northeastern GOM at depths of 100 to 400 meters. J.A. 605. While sightings have increased in the Northern, Western, and Central GOM Planning Areas, J.A. 605, Interior found them insufficient to be representative of all mammals across the GOM. Instead, it selected the sperm whale, which ranges throughout the GOM, undertakes long-distance migrations across a broad bathymetric range, dives thousands of meters in search of deepwater squid, and has served since at least 2007 as the GOM region's conservation-indicator species for inter-regional environmental sensitivity modeling. J.A. 242–44. Petitioners have not shown that Interior overlooked existing information or acted arbitrary in reaching that decision.

Interior further explained that a final designation of the Rice's whale's critical habitat was pending and that any necessary adjustments would be addressed at the lease-sale stage, when specific blocks are selected for development. J.A. 605. Petitioners mount their challenge as a Section 18(a)(2)(H) claim. However, their argument is best understood as a claim under the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), which requires consultation only when an agency action "may affect" a listed species or its critical habitat. *See*

50 C.F.R. §§ 402.13, 402.14.  Even if so construed, that claim is not ripe for review.

In *CBD I*, we rejected a nearly identical argument that Interior's failure to consult at the program-approval stage violated the ESA, holding that such a claim was premature under OCSLA's multi-stage leasing structure.  563 F.3d at 482–83.  The "segmented nature" of OCSLA programs, we explained, is a mitigating measure that allows "graduated compliance with environmental and endangered life standards," making ESA compliance "more likely to be satisfied both in an ultimate and a proximate sense."  *Id.* (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980)).  Because environmental effects must be evaluated on a stage-by-stage basis, an ESA consultation obligation arises only when a particular stage of the program will affect listed species or critical habitat.  Completion of the first stage does not, by itself, authorize any activity that causes harm to protected species.

That reasoning applies here.  At the program stage, leasing areas may be identified that Interior ultimately chooses not to lease.  The record confirms that the proposed areas for Program leasing "do not overlap with the core distribution area of Rice's whales" in the Eastern GOM. J.A. 1913.  It is therefore not certain that any leasing activity in or near the proposed critical habitat will occur, let alone that such activity will adversely affect the species.  Delaying review until a later stage, when any such impacts are concrete and the ESA consultation obligation is triggered, will allow both Interior and this Court to assess the claim on a more developed and definite record. *See CBD I*, 563 F.3d at 483.  Any hardship to Petitioners from postponing review is outweighed by these institutional interests in orderly and stage-specific decision making.

In 2022, Interior analyzed, explained, and concurred with a recommendation for Preliminary Wind Energy Area (WEAs) designation in the GOM region. J.A. 1835–78. As part of that offshore wind planning, Interior considered protected species, including the Rice's whale, and referenced its 100-400 meter habitat for exclusion. J.A. 1868–69, 1878. Petitioners contend that Interior's exclusion of Rice's whale habitat in the offshore wind-leasing context, but not in the Program's leasing analysis, disregards Interior's own acknowledgment of the species' vulnerability across the GOM.

We agree that the contrast between Interior's exclusion of Rice's whale habitat from offshore wind leasing in the Western and Central GOM and its selection of the sperm whale here may appear eyebrow-raising at first glance. Still, that apparent inconsistency does not compel a different outcome. Interior's decision to concur with Preliminary WEA recommendations in the offshore wind-leasing context arose under a different statutory scheme, addressed different development impacts, and followed a distinguishable methodological approach. J.A. 1837 (citing 43 U.S.C. § 1337(p)(4)(A), (B), (D), (F), (I), and (J)). Interior also explained that "identification of Preliminary or Final WEAs does not constitute a final leasing decision, and BOEM reserves the right under its regulations to issue leases in smaller, fewer and/or different areas—or issue no leases." J.A. 1837. Even if Petitioners were correct that Interior effectively set aside the Rice's whale environment in that context, its decision to take a different approach here is permissible so long as it provides a reasoned explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Because the methodologies for considering the Rice's whale habitat differ across the two regulatory schemes, Petitioners have not shown that the contrast in outcomes was arbitrary.

With those claims resolved, Petitioners' remaining disagreement concerns how Interior applied the record evidence through its chosen methodology, not with any failure to consider the underlying facts. Because their challenge reflects a policy preference rather than an arbitrary application of facts to the methodology, their claims fail.

Interior's selection under its methodology shows no error. To meet its obligations under Section 18(a)(2)(G) of OCSLA, Interior developed the Relative Environmental Sensitivity Analysis (RESA), a model designed to evaluate regional vulnerability to offshore oil and gas activity based on biological and ecological indicators. J.A. 1462. RESA calculates environmental sensitivity scores for each planning area using representative "parameters," known as "individual species or a specific habitat," grouped into faunal parameters (such as marine mammals) and habitat-based ecological features. J.A. 1473. For each faunal group, RESA applies two criteria: the species' conservation importance, determined by its ESA status, and its ecological role within the OCS region. J.A. 1473. Conservation status is ranked in order: first ESA-listed species, then ESA-threatened species, and then ESA candidates. J.A. 1474.

For marine mammals, Interior relied on information developed by the National Marine Fisheries Service (NMFS) and applied a defined process. J.A. 1478. It first compiled "a table of all federally listed, threatened, and endangered species of marine mammals" in each OCS region, noting "status and presence of a corresponding critical habitat." J.A. 1478. It then assessed abundance using "the known prevalence or frequency of sightings" from Stock Assessment Reports and "actual sightings per unit effort data" from offshore projects, generally disfavoring species "rarely sighted." J.A. 1478-79. Interior favored species with robust datasets over those with limited

research and, all else being equal, preferred those with "designated 'critical habitat.'" J.A. 1479. It also considered whether a species was the "most frequently sighted large cetacean" in the region. J.A. 1479. In regions with more than four qualifying endangered species, Interior's tiebreaker process first selected the species with critical habitat and then the one with the lowest PBR value. J.A. 1479.

Although Interior acknowledged the Rice's whale's precarious status, it again selected the sperm whale as the GOM region's representative marine mammal of conservation importance, just as it had in 2014. J.A. 320, 1616. Under the RESA framework, Interior considered ESA-listed status, abundance, available information, and frequency of sightings, but did not factor in proposed critical habitats or the lowest PBR value as a tiebreaker metric. Interior determined that both species are ESA-listed with presumed year-round resident populations. J.A. 605. It also found that the best abundance estimate for the sperm whale is 763 individuals, compared to 33 individuals for the Rice's whale, with the full population likely numbering fewer than 100. J.A. 605, 1709, 1913.

On frequency of sightings and acoustic detections, Interior concluded that Rice's whales are observed almost exclusively in the Northeastern GOM in the DeSoto Canyon area. J.A. 605. It acknowledged, however, that recent limited evidence indicates the Rice's whale may be present between the 100-meter and 400-meter isobaths across the Northern GOM, and that NMFS has proposed a critical habitat designation for the species encompassing those waters. J.A. 605 (citing 88 Fed. Reg. 47,453/3 (July 24, 2023)). Even so, Interior found that little is known "about Rice's whale density, abundance, habitat usage patterns and other factors in the central and western" GOM. 89 Fed. Reg. 31,488/02 (Apr. 24, 2024). Since Interior re-selected the sperm whale, we presume its frequency-of-

sightings data and available-information metrics were carried forward from the prior selection. Tellingly, Interior also selected the sperm whale in the Gulf of Alaska, East Bering Sea, Washington/Oregon, and California. J.A. 1616.

Petitioners argue that the conservation factors favored selecting the Rice's whale. In their view, the species' prior ineligibility for consideration in 2014 should now weigh against continuing to designate the sperm whale. They note that the Rice's whale has proposed critical habitat, and that its PBR is 0.07 compared to the sperm whale's 2.0. J.A. 605, 1709. On their account, the Rice's whale should have prevailed under RESA's tiebreaker.

Section 18(a)(2) of OCSLA does not require Interior to prioritize every relevant factor equally. *Watt I*, 668 F.2d at 1307 (recognizing that "speculative nature of any information may well affect the weight the Secretary attaches thereto in drawing up the leasing program"). Nor does it mandate adopting one species over another simply because it would score higher on a single measure. Instead, Interior's RESA model weighed the species' prevalence and data sufficiency of ecological role together with its conservation importance. J.A. 1478–79. As applied, Interior gave greater weight to the sperm whale's GOM-wide range and extensive monitoring record, identifying it as the "[o]nly endangered whale species to occur in relatively high abundance" in both the Eastern and Western GOM. J.A. 1622, 1624. Neither species has a final critical habitat designation, so this factor was not considered for either in the RESA scoring. J.A. 605.

Beyond that, Interior was not required to reach RESA's lowest-PBR tiebreaker because the sperm whale prevailed under the weighted prevalence criteria. Although both species are ESA-listed, the sperm whale outscored the Rice's whale on

abundance (763 individuals to 33), GOM-wide distribution (present throughout the entire GOM versus primarily Northeastern GOM), frequency of sightings, and volume of available scientific and monitoring data. J.A. 605, 1709. Those advantages, in our view, were sufficient to determine the representative species without resorting to the tiebreaker.

The record reflects a deliberate, albeit counterintuitive, triage judgment. Choosing the more abundant species over the more imperiled reflects Interior's view that, in the event of a major spill, a proportional loss from a larger population may produce broader ecological disruption across the GOM. That approach prioritizes a representative species found throughout the GOM over one concentrated in a smaller range, maximizing the model's coverage of region-wide sensitivity. Moreover, Interior explained that the composite sensitivity score for the GOM region was 19.6, the highest among all regions, had already reflected multiple sensitive taxa, not any single indicator species. J.A. 322–23. Petitioners have not shown that substituting the Rice's whale would have materially changed that score or altered leasing decisions.

Finally, Petitioners do not challenge Interior's RESA methodology. Instead, they criticize Interior's reliance on its decade-old application of that methodology to select the representative marine mammal for the GOM, contending that the agency ignored existing scientific information about the Rice's whale. That argument overlooks the fact that Interior's environmental sensitivity analysis was redeveloped using a "new method." J.A. 1464. To the extent Petitioners take aim at this iteration of RESA, we have held that "[w]here existing methodology . . . is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information." *Watt II*, 712 F.2d at 600. That dooms their claims. Interior considered

the relevant data, applied its methodology, and provided a reasoned, explanation for its choice.

We conclude that Interior satisfied its obligations under Sections 18(a)(2)(A), (H), and (G).

**3.**

The GOM region is not defined solely by oil and gas activity. It is also home to a diverse array of industries and cultural practices that depend on stable marine conditions and open access to ocean space. Commercial and recreational fisheries contribute billions of dollars to the regional economy, supporting livelihoods tied to healthy habitats and predictable migratory patterns. J.A. 300, 304, 557. Aquaculture operations, identified as a key component of national food security goals, are expanding along the Gulf Coast. J.A. 302, 543. Offshore wind development is gaining momentum as part of the nation's transition to renewable energy. J.A. 542. Many of these activities occur in areas that overlap with, or lie adjacent to, potential Program leasing blocks. J.A. 301, 307.

Petitioners argue that Interior failed to consider whether Program leasing may interfere with other present or anticipated uses of the GOM region. Section 18(a)(2)(D) of OCSLA requires the Secretary to consider "the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sea lanes, potential sites of deepwater ports, and other anticipated uses of the resources and space" of the region. 43 U.S.C. § 1344(a)(2)(D). By Petitioners' account, Interior merely identified these other uses without evaluating whether new leasing may impede them, thereby preventing the proper balancing required under Section 18(a)(3) of OCSLA. We disagree.

Interior discussed other uses of the GOM region, identifying multiple categories: commercial, recreational, and subsistence fishing; tourism; navigation and marine infrastructure; military operations; renewable energy; and non-energy marine minerals. J.A. 294–309, 612–13. For each category, Interior described current activities, economic significance, and potential spatial overlap with oil and gas leasing. J.A. 300–04, 307–08, 612–13. Interior also acknowledged the increasing presence of aquaculture projects in the GOM region, mapped designated "opportunity areas" for aquaculture development, and recognized that these operations could overlap with oil and gas activity. J.A. 300–03. Interior also described the importance of subsistence fishing to Cajun communities, Indigenous peoples, and communities of Vietnamese heritage, and noted the economic weight of the commercial fishing sector. J.A. 300–04, 612–13.

By Petitioners' telling, Interior's analysis should have gone further than identifying conflicts. In their view, Interior failed to determine impediments to these uses, pointing to the absence of quantified analysis of fishing ground closures or oil spill contamination. Petitioners' arguments rest on a more expansive reading of Section 18(a)(2)(D) of OCSLA than the statute supports. The provision requires *consideration* of "other anticipated uses," not preemptive resolution of all potential conflicts. 43 U.S.C. § 1344(a)(2)(D).

Section 18(a)(2)(D) of OCSLA does not require mitigation at the program stage, as Petitioners contend. *See id.*; *id.* § 1802. Mitigation presupposes knowing which lease blocks will be offered, their locations, and any site-specific conflicts, which is information unavailable at the program stage. Interior addressed use conflicts at the level the statute requires by identifying conflicts and explaining anticipated future impacts. In the EIS, Interior noted that fish and fish habitat can "be

affected by exposure to spilled oil" and identified such impacts as a potential risk of future development. J.A. 770. That explanation, together with Interior's mapping of aquaculture areas, identification of overlapping uses, and recognition of cultural and economic stakes, satisfies Section 18(a)(2)(D).

Petitioners also argue that Interior listed offshore wind development as a potentially competing use without assessing conflicts between wind leasing and new oil and gas leasing. Not so. Interior mapped existing wind planning areas alongside oil and gas pipelines and active leases, J.A. 301; described the potential impacts of offshore wind projects including noise, lighting, benthic disturbance, and increased collision risks for marine mammals and birds, J.A. 543; and acknowledged that wind lease areas could overlap with oil and gas program areas, J.A. 307–08. At the Program stage, Interior lacks knowledge about which specific blocks within the 94-million-acre GOM Program area will be leased. J.A. 46, 149. That level of detail is necessary to evaluate potential infrastructure conflicts. As we explained in *Watt II*, "[g]reater specificity is anticipated at each stage" of the process, 712 F.2d at 592, and the statute does not require granular conflict resolution before lease areas are defined.

Petitioners also contend that Interior should have exercised "Subarea Options" to omit acreage and minimize conflicts. Interior considered those options but chose to retain flexibility to omit acreage through "targeted leasing" at later stages "when more regional and site-specific information is available." J.A. 213. That approach allows Interior to address potential conflicts, including those involving fishing, aquaculture, and wind development, when concrete proposals and site data are in hand. Nothing in Sections 18(a)(2)(D) or 18(a)(3) of OCSLA mandates exclusion of areas at the Program stage.

OCSLA requires Interior to consider other present and anticipated uses of the OCS and to balance the Section 18(a)(2) factors in setting a leasing schedule. It does not require preemptive elimination of all potential conflicts. *See CBD I*, 563 F.3d at 488–89; *Watt I*, 668 F.2d at 1305, 1309–10. The record here shows that Interior identified overlapping uses, mapped relevant infrastructure, recognized potential risks, and adopted a process for addressing conflicts at later stages through coordination with other agencies and targeted leasing. That is the stage-appropriate analysis OCSLA contemplates. Accordingly, we conclude that Interior complied with Section 18(a)(2)(D) of OCSLA and reject Petitioners' contention that this alleged deficiency prevented the proper balancing required by Section 18(a)(3).

**B.**

Section 18(a)(3) then directs the Secretary to "select the timing and location of leasing" by weighing those considerations "to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." *Id.* § 1344(a)(3).

**1.**

Petitioners argue Interior failed to include environmental justice in its Section 18(a)(3) balancing. Our precedent instructs that costs should be quantified, when possible, particularly when they are "not inherently insusceptible of quantitative analysis." *CSE*, 779 F.3d at 610 (quoting *Watt I*, 668 F.2d at 1319). Quantification is not required, however, where no settled methodology exists. *See id.* at 611 (citing *Watt II*, 712 F.2d at 600) (recognizing that an agency has "broad discretion" to proceed on available information).

Interior confirms that no established practice exists for quantifying community-level effects, a limitation our precedent recognizes as permitting qualitative treatment. *Id.*

Interior identified environmental-justice considerations, acknowledged the limits of monetizing them, and incorporated them qualitatively into the Program's balancing. J.A. 561, 1170, 1201. Interior explained that it "currently lacks the capability to quantitatively assign benefits and costs among different demographic groups" and that the net benefits analysis "do[es] not disaggregate the impacts on vulnerable coastal communities from the monetized impacts on the Nation as a whole." J.A. 1170, 1201. Interior noted that distributional impacts would be addressed contextually at later stages when more location-specific information becomes available. J.A. 1170. Rather than ignore these costs, Interior weighed them qualitatively alongside other non-monetizable factors.

That approach is consistent with precedent. In *CSE*, we rejected a claim that Interior acted irrationally by declining to quantify the "informational value of delay" although relevant to Section 18(a)(3) timing. 779 F.3d at 611–12. We held that Interior could evaluate that factor qualitatively because no "sufficiently well established" valuation method existed, and Interior was "free to choose any methodology so long as it is not irrational." *Id.* at 611 (citation omitted). Our view reflected that when quantification would demand speculative inputs and "a 'substantial amount of data,'" Interior may proceed qualitatively, and courts review only for "obviously incorrect results or methodology." *Id.* at 612 (citations omitted).

Here, Petitioners identify no settled, administrable method for pricing distributional and community-level burdens from regionwide leasing at the program stage. Interior candidly acknowledged that constraint and addressed environmental-

justice concerns qualitatively.  J.A. 561, 1170.  That approach is consistent with past program decisions upholding qualitative treatment where quantitative modeling would require unprecedented assumptions, uncertain data, and resource-intensive projections.  *CSE*, 779 F.3d at 611–12.

Petitioners challenge that view, arguing that because Interior modeled catastrophic oil-spill risks, it should have modeled environmental-justice burdens too.  The comparison is inapt.  Oil-spill risk lends itself to probabilistic modeling at the scale of a five-year program.  Distributional burdens turn on localized siting, traffic patterns, and mitigation measures that are unknown until later stages.  Interior reasonably treated the former with quantitative tools and the latter with qualitative analysis, while committing to revisit distributional impacts as decisions crystallize.  J.A. 561, 1170, 1201, 1214.  That kind of tiered treatment is permitted when methods for monetization are not well established.  *CSE*, 779 F.3d at 611–12.

**2.**

Petitioners contend that Interior could not have achieved the statutory balance OCSLA requires because it failed to fully account for the Rice's whale's environmental sensitivity under Section 18(a)(2), thereby skewing the balancing required under Section 18(a)(3).  We have concluded that Interior satisfied Section 18(a)(2)(G) by applying its RESA methodology to select the sperm whale over the Rice's whale for the GOM region.  *Supra* pp. 27–31.  That holding forecloses Petitioners' derivative balancing claim.  Section 18(a)(3) incorporates the factors enumerated in Section 18(a)(2) into its weighing process but does not require Interior to assign those factors the weight Petitioners prefer.  *See CBD I*, 563 F.3d at 484–85 (citing *Watt I*, 668 F.2d at 1318) (explaining that "cost-benefit analysis of oil and gas extraction under [S]ection 18(a)(3) is

satisfactory when an individual area's potential benefits are weighed against its potential costs").

Petitioners further argue that Interior failed to weigh the extinction-level risk that additional leasing could pose to the Rice's whale in its net benefits analysis, despite record evidence that oil and gas leasing activity in the Western GOM may cause the species' disappearance. They point to evidence that the Western GOM has high levels of vessel traffic, oil and gas exploration including seismic surveys, and production activity, which together could drive the species to extinction. J.A. 1729, 1751. Petitioners emphasize that vessel strikes and industrial noise are serious threats and that the loss of even a single whale could imperil the species' survival. J.A. 1729.

We conclude that Interior is not required to perform a separate, species-specific cost calculation for the Rice's whale. Interior's environmental balancing analysis is multi-layered. First, it evaluates the environmental sensitivity of BOEM ecoregions, which are geographic units defined by physical and ecological characteristics that may encompass multiple program areas. J.A. 312–15. For the GOM region, the 2024–2029 Program's lease blocks fall within two BOEM ecoregions: the Western and Central GOM Ecoregion and the Eastern GOM Ecoregion. J.A. 315. The environmental sensitivity of each ecoregion is assessed using an ecosystem-based approach that treats all regions equally without bias and weighs all species and habitats equally. J.A. 312.

Second, within each BOEM ecoregion, Interior uses the RESA model to identify indicator species that represent the region's overall sensitivity. J.A. 1462. As discussed, Interior selected the sperm whale, concluding that it more appropriately served as the indicator species for the GOM region's marine mammal group. J.A. 1462. Bearing that reasoned choice in

mind, Petitioners have not shown that the Rice's whale was statutorily required to be considered beyond this step or that substituting it for the sperm whale would have materially changed the composite sensitivity score or altered leasing decisions. J.A. 322–23.

Finally, the composite environmental sensitivity scores from the RESA model, along with other statutory factors, feed into the Section 18(a)(3) balancing analysis. The composite score for the GOM region was 19.6, the highest among all OCS regions, reflecting the aggregate sensitivity of multiple taxa rather than any single species. J.A. 322–23. The risks posed to the Rice's whale, and all other non-selected species, are among the environmental harms captured in that aggregate score through the selection of the sperm whale as the representative species. Requiring Interior to cherry-pick non-selected species to balance extinction costs against leasing benefits would serve no interest beyond Petitioners' own and would be akin to judging the strength of a rope by yanking on one thread instead of testing the whole braid. Section 18(a)(3) does not require Interior to isolate or separately quantify the cost of losing a single species so long as relevant environmental harms are reasonably reflected in the aggregate.

****

We conclude that Interior's Section 18(a)(3) balancing satisfied OCSLA's requirements because it considered relevant environmental and economic factors, applied its methodology consistently, and reasonably declined to adopt Petitioners' preferred species-specific weighting.

40

## V.

For the foregoing reasons, we deny the petition for review.

*So ordered.*